# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 15-1056

**STATE OF LOUISIANA**

**VERSUS**

**JON WRAY BAUMBERGER**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2519-11
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JOHN E. CONERY**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, John E. Conery, and David Kent Savoie, Judges.

**AFFIRMED WITH INSTRUCTIONS.**

**John F. DeRosier**
**District Attorney**
**Tara B. Hawkins**
**Chief Felony Prosecutor**
**Carla S. Sigler**
**Assistant District Attorney**
**Karen McLellan**
**Assistant District Attorney**
**14ᵗʰ Judicial District Court**
**901 Lakeshore Drive, Suite 800**
**Lake Charles, Louisiana  70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Chad Ikerd**
**Louisiana Appellate Project**
**Post Office Box 2125**
**Lafayette, Louisiana  70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Jon Baumberger**

**Jon W. Baumberger**
**Oak 1, Main Prison**
**Louisiana State Prison**
**Angola, Louisiana  70712**
**Pro se**

**CONERY, Judge.**

Defendant was found guilty of the second degree murder of his wife and was sentenced to life imprisonment without the possibility of probation, parole, or suspension of sentence. Defendant appealed the judgment of the trial court. For the following reasons, we affirm with instructions.

## FACTS AND PROCEDURAL HISTORY

During the evening of December 5, 2010, Defendant, Jon Wray Baumberger, and his wife, Treasa Baumberger, had a physical altercation in their home, which resulted in Ms. Baumberger's (the victim's) death. Defendant claims that he and the victim had spent the day watching television and drinking. An altercation ensued, and the victim allegedly hit Defendant with a space heater and attempted to strangle him. The victim died during the altercation, however, Defendant does not remember killing her. Defendant alleges that upon waking, he found the victim unresponsive and proceeded to call 911.

On January 20, 2011, Defendant was indicted for second degree murder, a violation of La.R.S. 14:30.1. On June 23, 2014, Defendant filed a pro se "Motion to Quash," which was denied on July 10, 2014. On February 4, 2015, Defendant filed a "Motion to Quash Bill of Indictment for Expiration of Limitation on Trial, with Incorporated Memorandum ([La.Code Civ.P.] arts. 531, 532, 578 *et seq*.)." The motion was denied in open court on February 10, 2015.

A jury trial commenced on February 10, 2015, and on February 27, 2015, Defendant was found guilty as charged. Defendant was sentenced on April 20, 2015, to life imprisonment without the possibility of parole, probation, or suspension of sentence. Defendant filed a "Motion for Reconsideration of Sentence" on May 13, 2015. The motion was denied on May 18, 2015.

Defendant has perfected a timely appeal, wherein there are three attorney-filed assignments of error and seven pro se assignments of error. For the following reasons, we find there is no merit to any of the assignments of error.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there is one error patent.

The record does not indicate that the trial court advised Defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Thus, we direct the trial court to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof in the record that Defendant received the notice. *See State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

## DISCUSSION

*Assignments of Error One and Two; Pro Se Assignment of Error One*

Defendant argues that the State failed to prove beyond a reasonable doubt that he had the requisite specific intent to commit the murder. Defendant argues that he was attempting to defend himself after the victim struck him with a space heater unit and tried to strangle him, and then due to extreme intoxication, he accidently killed her. Accordingly, he argues the killing of the victim was justifiable homicide. In the alternative, Defendant suggests that his actions which resulted in the victim's death were committed in the heat of blood; therefore, the facts support only a conviction for manslaughter.

The analysis for a claim of insufficient evidence is well settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied,* 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King,* 436 So.2d 559 (La.1983); *State v. Duncan,* 420 So.2d 1105 (La.1982); *State v. Moody,* 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino,* 436 So.2d 559 (citing *State v. Richardson,* 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Defendant was convicted of second degree murder. The offense is defined as "the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm[.]" La.R.S. 14:30.1. "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). Specific criminal intent may be inferred from the circumstances present in the case and the actions of the defendant. *See State v. Carroll,* 95-859 (La.App. 3 Cir. 1/31/96), 670 So.2d 286.

The victim's twenty-seven year old son, Bradley Riales, was the first to testify at trial. He is one of five of the victim's children. He stated that his mother lived in Linden, Tennessee, until 2009, when she moved to Lake Charles, Louisiana with Defendant. Mr. Riales testified that the victim was a single mother until she married Mr. Williams when Mr. Riales was about ten years old. Up until that time, the victim worked as a seamstress to support the family. She also

worked as an exotic dancer but quit that profession when she married Mr. Williams. She was forty-eight years old when she died.

Mr. Riales testified that his mother suffered from fibromyalgia, arthritis, and breast cancer. He testified that she also had hepatitis C. He knew that she took prescription drugs for her ailments but never knew her to abuse the drugs. While he testified he was close to his mother and he kept close contact with her after she moved to Louisiana, he did not know that she suffered from a mental condition or disorder, specifically, a bipolar disorder. Mr. Riales did state, however, that the victim had a problem with alcohol, as alcohol did not mix well with the medications she was taking.

Mr. Riales stated that he had met Defendant in 2009 at a bar in Tennessee. Defendant played bass guitar with a band. Mr. Riales was not certain how his mother met Defendant, but about sixteen months after she met him, she moved to Lake Charles with Defendant after he secured a job with the airline industry. Mr. Riales stated that his mother's income consisted of disability payments. He said that his mother's relationship with Defendant appeared to be relatively normal. However, he indicated that Defendant drank excessively and would become belligerent. Mr. Riales believed his mother was a little over five feet, six inches tall and weighed one hundred to one hundred ten pounds.

Walter Swinford, Jr., the victim's brother, testified that the victim was his older sister. Mr. Swinford stated that he and his sister had always been very close, even after she moved to Louisiana. He testified that he and his sister had contact almost daily. He testified to her illnesses, which included bursitis and chronic joint pain. He said that she used two canes to walk when the arthritis pain was severe. Mr. Swinford testified that he was not aware that his sister had any mental disorder

4

and had no knowledge of her ever abusing her medications. Mr. Swinford stated that he had never seen her exhibiting odd behavior. He further testified that while his sister did drink, it was never excessive.

Mr. Swinford stated that his sister met Defendant in Tennessee in 2009. He spent several weekends with the couple while they were dating. Mr. Swinford stated that he never saw them physically fight, but they would have arguments. He said that he thought the relationship was one-sided. "My sister was in love with Jon, but Jon didn't - - didn't seem to be in love with her." He described Defendant as being "standoffish" with his sister's family in that Defendant did not want to be around them. Mr. Swinford thought that Defendant wanted to have total control over his sister. He further testified that he saw bruises on his sister, hand prints on her thighs and biceps, and black eyes during the time she and Defendant were dating. Mr. Swinford stated his sister never had bruises like that until after she starting dating Defendant and Defendant was the only one in the house.

Mr. Swinford stated he had no grudge against Defendant. He testified he saw Defendant drinking daily, starting in the morning until he could no longer stand. Further, Mr. Swinford stated that he never visited Defendant and his sister in Lake Charles. Mr. Swinford testified that his sister was five feet, nine inches tall. She was a head taller than Defendant, but he outweighed her, and she was not physically strong and used two canes to walk.

Robert Broussard, an information technician for Calcasieu Parish 911, testified that he received a call at 11:17 p.m. on December 5, 2010, from Defendant, wherein Defendant stated that the victim tried to kill him, but that she was dead now. Derek Goss, a sergeant with Calcasieu Parish Sheriff's Office, responded to the call and took Defendant into custody without incident. Defendant

advised him that he killed the victim in self-defense. The sergeant found the victim lying on the floor, partially inside the master bedroom closet. The sergeant stated he did not recall injuries to Defendant. However, upon being shown the booking photograph of Defendant, he agreed that Defendant had a bruise to his cheek bone and a black eye.

Sergeant William Spees, an investigator with the violent crimes division of the Calcasieu Parish Sheriff's Office, testified that Defendant told him at the scene that he and the victim were rehashing an old argument. Defendant said that when he went into the bedroom to go to bed, the victim came into the room and struck him on the face with a small space heater. The next thing Defendant knew, the victim was unresponsive on the floor. Sergeant Spees stated that it did appear there was a struggle in the bedroom. He noted a small space heater lying on the floor next to a turned-over television. Sergeant Spees described a bloody pillow and pillow case found behind the bedroom door. He said there was no weapon found in the bedroom, although a knife was sitting on a bedside table. In the bathroom, there was a shower assist chair, and in the living room, the sergeant saw two walking canes.

Sergeant Spees testified that the autopsy report put the time of the victim's death at about 8:00 p.m. on December 5, 2010, a little over three hours before Defendant called for 911 assistance. Although Defendant told the sergeant that he and the victim had been drinking eggnog with Jack Daniels during the day, the victim's toxicology report did not show alcohol in her system. However, the report revealed hydrocodone, Xanax, and Zonisanide detected in her blood. Blood taken from Defendant at the hospital at approximately 3:30 a.m. the following morning,

6

showed a .17 blood/alcohol content. Sergeant Spees testified that the autopsy put the cause of death as asphyxiation and the manner of death as homicide.

Finally, Sergeant Spees learned that the Baumbergers had a roommate, Donald Ray McMurtry. A recording of an interview with Mr. McMurtry was played for the jury. A transcription of the recording was put into the trial record.

Mr. McMurtry stated he had been living with the Baumbergers for about a month. He had known Defendant for a long time. He said Defendant's first wife died of cancer.. He said that when Defendant and the victim first moved to Lake Charles, they lived with him for a few weeks. Mr. McMurtry stated that on the day of the killing, the Baumbergers were watching a Saints game on TV. He said both of the Baumbergers were drinking. Around 4:30 p.m., when Mr. McMurtry left to go to work, Defendant and the victim were still watching television. He stated that he never saw the Baumbergers fight, "other than a typical argument between spouses ever so often." Mr. McMurtry stated that although Defendant was a heavy drinker, he had never known him to actually pass out.

Dr. Jayendra Patel, a board certified psychiatrist, was treating the victim at the time of her death. He testified that the victim suffered from bipolar disorder with a generalized anxiety disorder. The bipolar disorder was a mixed disorder, in that she suffered both mania and depression concurrently. He stated that the Zonisamide and Xanax had been prescribed by her former physician in Tennessee in 2004. Dr. Patel first saw the victim in July 2010, and last saw her in October 2010. He indicated that it appeared from the victim's medical records he received from her former doctor that the bipolar disorder manifested while the victim was in the hospital being treated for hepatitis C. Dr. Patel explained the Xanax and the Zonisamide were for sedation and the hydrocodone was for pain management. He

stated there was no reporting of violent tendencies, either from the victim or from her medical records.

Dr. Terry Welke, the Calcasieu Parish Coroner, performed an autopsy of the victim. He ultimately concluded that the cause of death was a lack of oxygen to the brain. Dr. Welke pointed out bruises on the victim's neck. While there were not extensive bruises to coincide with finger pads squeezing the victim's neck, there were marks on the victim's neck which were consistent with fingernail scratches. The victim also had a split, or cut, lip. Dr. Welke testified that the split lip could have been caused by a fist:

> [O]r another possibility is if somebody tries to suffocate somebody, to smother them, as they push something against the face, be it their hand to cover the mouth and the nose. . . . They try to shove it close to the face, and it can cause these bruises. So, I don't know if this is the result of a possible attempted smothering or a fist[.]

Dr. Welke theorized that "it was an attempted strangulation and suffocation. Smothering is another possibility. So, whether one caused the death or a combination of both, I don't know." Dr. Welke testified that the extent of injuries indicated that someone caused her death. There was internal bruising of the muscle around the victim's voice box, but the hyoid bone, located at the base of the tongue, was not broken. However, a broken hyoid bone is common in strangulation cases. There were also petechial, or little pink and blue dots caused by broken capillaries, in the eyes and eyelids, which are often found in strangulation or smothering cases. Dr. Welke reported that the victim was five feet, seven inches tall and weighed one hundred nineteen pounds at the time of death.

Dr. James Traylor was qualified as an expert in forensic pathology and testified on behalf of Defendant. While he agreed with Dr. Welke that the victim

died from the lack of oxygen to the brain, he suggested the damage to the victim's face, throat, and mouth was not enough for a typical strangulation or smothering attempt. Dr. Traylor suggested that "the other way of asphyxia would be to apply a choke hold." He explained that someone could come up behind a person, put their neck into the crook of their elbow, and squeeze until the flow of blood to the brain stopped. Generally, after the person passed out and the choke hold was released, the person regained consciousness. However, as explained by Dr. Traylor:

> Unfortunately, in the hands of somebody who doesn't know what they're doing, if you hold on those few extra seconds, maybe that individual goes limp, and you hold on for another ten or 15 seconds and then you let go, then you're in danger territory unless you know that that has happened - - then, you may have to institute - - immediately institute CPR and/or artificial respirations for that individual because they're not going to start breathing on their own. They've passed out. They've stopped breathing. And, they're not going to start unless you jump start them, so.

Working with the estimated time the victim died, about 8:00 p.m., until Defendant was taken by the police to the hospital to draw blood to determine his blood/alcohol content, at about 3:30 a.m., Dr. Traylor extrapolated that at the time of the victim's death, Defendant's blood/alcohol content was approximately .29 percent and possibly higher. Dr. Traylor concluded his testimony with the suggestion that the injuries to the victim indicated a fatal choke hold cut off the blood flow to the brain rather than an actual "occluding the airway."

While Defendant did not testify, the jury was shown a video of the police interrogation of Defendant shortly after he was taken into custody and *Mirandized* on the morning of December 6, 2010. The interview was transcribed and submitted into evidence. In the video, Defendant appeared intoxicated and continued to insist that he did not remember what happened or was not sure what happened. He stated that he loved the victim, but when he brought up the issue of

9

the herpes, the victim would become upset with him. He said he must have been defending himself and accidentally killed her. Defendant blamed the "Jack Daniels."

Defendant stated that he woke up around noon the day of the incident. He and the victim had watched football until around four o'clock in the afternoon, and he had a couple of beers and some eggnog. He made dinner, and they ate dinner. After dinner, he drank a couple more beers, had a few shots of whiskey, and then "chilled" while watching television. Defendant asserted that he was so intoxicated that he could not remember what he did to her after she hit him with the space heater, even though he did remember that she had attempted to strangle him.

Defendant asserts that, while attempting to defend himself against an attack by the victim, and because he was so intoxicated that he did not know what he was doing, he accidentally killed her. Defendant argues that the only disputed element of the alleged offense of second degree murder was that of specific intent to kill or inflict great bodily harm.

*Circumstantial evidence*

Defendant contends that "the jury could only make inferences regarding [his] intent to act based on circumstantial evidence." He lists the circumstantial evidence as the nature of his and the victim's relationship, the victim's prescription drug use, the altercation in the couple's bedroom, and inconclusive pathology evidence.

When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common

10

sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir. 1983). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams,* 13-497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied,* 13-2774 (La. 5/16/14), 139 So.3d 1024. Defendant's hypothesis of innocence is that he was defending himself and, because he was so intoxicated, he accidently killed her.

Defendant argues there was no evidence of an abusive relationship between him and the victim. He points out that Mr. Riales and Mr. McMurtry testified that they were a normal couple with a normal relationship. However, Mr. Swinford testified that he believed Defendant physically abused his sister. Mr. Swinford testified that he saw the couple often before they moved to Lake Charles and that he and the victim had frequent contact afterwards. He testified that he had seen bruising on her body, which was something not typical to the victim because she was not inclined to get into fights outside the home and Defendant was the only other person in the household at the time. Further, Defendant told the police during the interrogation that the victim had "laid him out a few times," indicating that the couple's co-existence may not have been as peaceful as Defendant claims.

Defendant further insinuates that the victim was a drug abuser, pointing out that the amount of hydrocodone found in the victim's system was slightly more than the amount necessary for its therapeutic value. However, we do not see how this is circumstantial evidence used by the jury to infer Defendant's guilt. The

toxicology report showed that there were no other drugs in the victim's system than what was prescribed for her illnesses.

In brief, Defendant correlates the victim's bipolar condition and her use of these drugs with violent tendencies, even though there was no testimony that the victim was a violent person other than Defendant's statements that she had struck him in the past and that, on the night in question, she hit him with the space heater and choked him in an attempt to kill him. Defendant implies that because Mr. Riales and Mr. Swinford, both of whom claimed to be close to the victim, did not know about her bipolar condition, the victim was not a truthful person when it came to disclosing her violent tendencies.

> However, as noted by the State:
>
> Dr. Patel testified that he did not just rely on Treasa's self reporting, but also the six years of records from Treasa's psychiatrist in Tennessee. According to Dr. Patel, "in the records that we have from Dr. Smith starting from 2004 onwards, which was six years duration, there wasn't any mention of any kind of violent behaviors or aggressive behaviors from my review of the records. Her self report did not include that. And, her visits with me when she was discussing all of these things with me did not raise any of those concerns."

Furthermore, it was not disputed that Defendant and the victim had an altercation in the bedroom. The victim's body was found in the bedroom. Defendant told the police that he was in the bedroom when the victim struck him with the space heater. While Defendant claims not to remember everything, he did agree that there was an altercation in the bedroom.

Defendant argues there was nothing in the testimonies of Dr. Welke or Dr. Traylor that would have allowed the jury to infer that Defendant had the specific intent to kill or cause great bodily harm to the victim. The doctors' testimonies established only that the victim died due to lack of oxygen to the brain. However,

Dr. Welke did agree with Dr. Traylor that there was a "feeble attempt at strangulation, yes[,]" and that "probably more likely than not there was a hand on that neck at one point in time or more than once at one point in time." Dr. Traylor inferred that because of Defendant's intoxication, his feeble attempt at strangulation was unsuccessful and he switched to another means. "[T]here is probably a component of smothering, as well. But, rather than the holding of the hand over the face or the shoving into an object or holding the pillow over, I think it's more of a chokehold cutting off blood flow[.]" While defendant argues that his intent to not hurt his wife is demonstrated by the fact he did not use the knife that was in his back pocket at the time of the incident, the jury's finding of specific intent is supported by evidence indicating Defendant's multiple attempts to asphyxiate his wife. There was no evidence that the victim killed herself, and there was no refuting that Defendant was the only person in the house when the victim died. As noted above, specific criminal intent may be inferred from the circumstances present in the case and the actions of the defendant. *Carroll*, 670 So.2d 286. In *State v. Mack*, 13-1311, pp. 9-10 (La. 5/7/14), 144 So.3d 983, 989, the supreme court noted:

> To preserve the role of the fact finder, *i.e.*, to accord the deference demanded by *Jackson*[*v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979)], this Court has further subscribed to the general principle in cases involving circumstantial evidence that when the fact finder at trial reasonably rejects the hypothesis of innocence advanced by the defendant, "that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville*, 448 So.2d 676, 680 (La.1984). A reasonable alternative hypothesis is not one "which could explain the events in an exculpatory fashion," but one that "is sufficiently reasonable that a rational juror could not 'have found proof of guilt beyond a reasonable doubt.'" *Id.* (quoting *Jackson* ). Thus, in all cases, the *Jackson* standard does not provide a reviewing court with a vehicle for substituting its appreciation of what the evidence has or has not proved for that of the fact finder. *State v. Pigford*, 05-0477, p. 6

(La.2/22/06), 922 So.2d 517, 521; *State v. Robertson*, 96-1048 (La.10/4/96), 680 So.2d 1165, 1166. A reviewing court may impinge on the "fact finder's discretion . . . only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988).

The Louisiana Supreme Court has explained the "hypothesis of innocence" stating:

> Consequently, before a trier of fact can decide the ultimate question of whether a reasonable hypothesis of innocence exists in a criminal case based crucially on circumstantial evidence, a number of preliminary findings must be made. In addition to assessing the circumstantial evidence in light of the direct evidence, and vice versa, the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.

*State v. Chism*, 436 So.2d 464, 469 (La.1983).

*Intoxication:*

Defendant argues that he was so intoxicated at the time of the offense that he could not have formed the requisite specific intent to either kill or inflict great bodily harm. The supreme court addressed the intoxication defense in *State v. Mickelson*, 12-2539, pp. 6-7 (La. 9/3/14), 149 So.3d 178, 183 (footnote omitted), as follows:

> Voluntary intoxication will not excuse a crime, but it is a defense to a specific intent offense if the circumstances demonstrate that intoxication precluded formation of the requisite intent. *See* La. R.S. 14:15(2); *State v. Legrand*, 02-1462, p. 7 (La. 12/3/03) 864 So.2d 89, 95-96. The defendant has the burden of proving his intoxication defense; thereafter, it falls to the state to negate that defense by showing beyond a reasonable doubt that specific intent was present despite the defendant's alleged intoxication. *See State v. Smith*, 94-2588, p. 5 (La.App. 4 Cir. 3/27/96), 672 So.2d 1034, 1038, citing *State v. Davis*, 92-1623, p. 10 (La. 5/23/94), 637 So.2d 1012, 1020.

Whether voluntary intoxication in a particular case is sufficient to preclude specific intent is a question to be resolved by the trier of fact. *See Davis*, 92-1623 at 10, 637 So.2d at 1020.

Testimony at trial established that Defendant was a heavy drinker, who drank daily. Defendant's blood/alcohol content was analyzed on the morning of December 6, 2011, at approximately 3:30. At that time, his blood/alcohol content was .17 percent, twice the legal limit to operate a vehicle. Dr. Traylor extrapolated that at the time of the victim's death, estimated to have occurred at 8:00 p.m., Defendant's blood alcohol content was approximately .29 percent or possibly higher. This estimate was based on the assumption that Defendant did not drink anymore alcohol in the three hours between the victim's death and the time Defendant called the police.

In brief, Defendant argues:

> Dr. Traylor also testified that someone with such as significantly elevated BAC, even someone that drinks as much as Jon, could certainly experience memory loss. (R. at 1776-77.) Becoming unconscious or passing out was also a likely probability. (R. at 1776). Thus, when Jon told police that the first thing he could remember after Treasa hit him in the head with the heater was seeing Treasa unresponsive and calling 911, it was definitely reasonably possible he blacked out for some time, even if he did not pass out immediately. The blow to the head and his inebriated state could have caused Jon's memory loss. During the period he cannot recall, the altercation between the couple could have occurred in their room, resulting in Treasa dying and Jon passing out after exerting himself and being injured as well.

We note that while Dr. Traylor testified that besides passing out, a blackout or memory loss was possible at that level of blood/alcohol content, there was no testimony that if the event could not be remembered, specific intent could not have been formed. Further, Dr. Traylor agreed that Defendant could have elevated his blood/alcohol content had he continued to drink alcohol during the three and a half hours between the approximated time the victim died and the time he called the

15

police. While Defendant may not have entered into the confrontation with the victim with the intent to kill or harm her, specific intent can be formed in an instant. *State v. Cousan*, 94-2503 (La. 11/25/96), 684 So.2d 382.

We find that Defendant failed to establish that he was so intoxicated that he could not form the intent to kill or inflict great bodily harm on the victim.

*Self-defense:*

Even though Defendant claims to not remember all of the events that lead to the death of the victim, he argues in brief that he was defending himself; therefore, the killing was justified. Louisiana Revised Statutes 14:20, in pertinent part, provides:

> A. A homicide is justifiable:
>
> (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

When a defendant claims self-defense in a homicide case, the State bears the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense. *State v. Taylor*, 03-1834 (La. 5/25/04), 875 So.2d 58. Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary are the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. *State v. Free*, 48,260 (La.App. 2 Cir. 11/20/13), 127 So.3d 956, *writ denied,* 13-2978 (La. 5/30/14), 140 So.3d 1174, *and writ denied*, 14-39 (La. 9/19/14), 148 So.3d 944. Thus, the issue would be whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

16

could conclude the state proved beyond a reasonable doubt that the defendant did not act in self-defense. *State v. Rosiere*, 488 So.2d 965 (La.1986).

As noted above, the killing would be justified if Defendant reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm and that the killing was necessary to save himself. It was established at trial that the victim, although taller than Defendant, was in frail health and suffered from arthritis requiring her to use two canes to walk. There was evidence that the victim required a shower-assist chair because of her arthritis and chronic joint and muscle pain. The victim was so disabled that at forty-eight, she was receiving disability payments. Furthermore, even though she may have hit Defendant with the space heater and put her hands around his neck, Defendant could have knocked her down with one push. Defendant relies on Dr. Traylor's speculation that Defendant attempted to subdue her by using a choke hold and accidently killed her. However, we find that once the victim was down on the floor, it would not have been necessary to immobilize her with a choke hold to save his own life.

*Accident:*

Defendant also argues that because he was highly intoxicated at the time and was not really aware of what was happening after the victim struck him in the face with the space heater, her death was an accident. Defendant relies on Dr. Traylor's speculation that he placed a choke hold on the victim but held it too long and did not or was not able to resuscitate her. Accordingly, he would have at most been guilty of the responsive verdict of negligent homicide, which is defined as "[t]he killing of a human being by criminal negligence." La.R.S. 14:32(A)(1).

> Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross

17

deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.

La.R.S. 14:12. However, since the jury found specific intent beyond a reasonable doubt, and that finding was supported by the evidence, albeit circumstantial, the victim's death was not accidentally caused.

On appeal, this court should not assess the credibility of the witnesses or reweigh the evidence to overturn the jury's determination of guilty. *State v. Glynn*, 94-332 (La.App. 1 Cir. 4/7/95), 653 So.2d 1288, *writ denied*, 95-1153 (La. 10/6/95), 661 So.2d 464. Considering the totality of the evidence and the circumstances in a light most favorable to the State, we find that the evidence proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that Defendant exhibited the specific intent to kill or inflict great bodily harm on the victim. Furthermore, the State met its burden of proof that the killing was not committed during Defendant's attempt to defend himself and was therefore not justified.

*Manslaughter:*

Finally, Defendant argues that, alternatively, he killed the victim in the heat of blood after being struck in the face with the space heater. He suggests that this court could find that the facts support a conviction for manslaughter, which is:

> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

La.R.S. 14:31.

18

This court has held that "'[s]udden passion' and 'heat of blood' are not elements of the crime of manslaughter. They are factors which mitigate against finding a defendant as culpable as a person who commits a homicide without the occurrence of any extenuating event." *State v. Stewart*, 00-143, p. 4 (La.App. 3 Cir. 10/4/00), 771 So.2d 723, 726, *writ denied*, 00-3135 (La. 11/2/01), 800 So.2d 866. In this case, manslaughter would exist if Defendant had proved by a preponderance of the evidence that mitigating factors, such as provocation, existed. *State v. Baldwin*, 96-1660 (La. 12/12/97), 705 So.2d 1076, *cert. denied*, 525 U.S. 831, 119 S.Ct. 84 (1998). Provocation is a question of fact that must be determined by the trier of fact. *State v. Scott,* 09-138 (La.App. 4 Cir. 11/18/09), 26 So.3d 283, *writ denied*, 09-2773 (La. 6/18/10), 38 So.3d 320.

In brief, Defendant argues only that "the trial court erred by not finding that [his] action[s], as a result of being stuck [sic] in the face by his wife with a heater, were sufficiently mitigated and done in the heat of blood." In this case, Defendant indicated in his interview with the police that the argument regarding the victim's failure to disclose the fact she had herpes was an ongoing contention. Defendant further said that she had struck him on prior occasions, which did not cause him to lose his self-control and cool reflection those times. "Further, an argument alone will not be a sufficient provocation in order to reduce a murder charge to manslaughter. *State v. Miller*, 98-642 (La.App. 3 Cir. 10/28/98), 720 So.2d 829, [*writ denied*, 98-3118 (La. 5/14/99), 741 So.2d 659,] citing *State v. Gauthier*, 546 So.2d 652 (La.App. 4 Cir.1989)." *State v. Charles*, 00-1611, p. 4 (La.App. 3 Cir. 5/9/01), 787 So.2d 516, 519, *writ denied*, 01-1554 (La. 4/19/02), 813 So.2d 420.

We note that it was Defendant's self-serving statement to the police that the victim escalated the argument by striking him with a small space heater initially,

rather than after the physical confrontation began. Thus, the jury had to discern whether the homicide should be reduced from second degree murder to manslaughter committed in sudden passion or heat of blood. Once the jury concluded that Defendant exhibited specific intent to kill or seriously harm the victim, the possibility of manslaughter was foreclosed. As noted above, testimony established that it apparently took time to asphyxiate the victim. It is obvious that the jury concluded that this homicide was not committed in the heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control.

We find no merit to these assignments of error.

## ASSIGNMENT OF ERROR NUMBER TWO AND PRO SE ASSIGNMENT OF ERROR NUMBER SEVEN:

Defendant argues that his substantive due process rights "were violated because the State was not held to its burden of proof to convince all 12 'reasonable' jurors of its case." The verdict was not unanimous but an eleven to one vote for guilty. Defendant concedes that the Louisiana Supreme Court has allowed felony convictions on less than unanimous verdicts as constitutionally permissible. *State v. Bertrand*, 08-2215, 08-2311 (La. 3/17/09), 6 So.3d 738.

Louisiana Code of Criminal Procedure Article 782(A) provides as follows:

> Cases in which punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict. Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. Cases in which the punishment may be confinement at hard labor shall be tried by a jury composed of six jurors, all of whom must concur to render a verdict.

Defendant points out that during trial, he argued that the jury verdict must be unanimous. Defendant argues that recently, "the United States Supreme Court's

plurality decision's reasoning in *Apodaca v. Oregon,* 406 U.S. 404[, 92 S.Ct. 1628] (1972), has come into question due to more contemporary Supreme Court cases." This court addressed a similar argument in *State v. Hardy*, 11-267, pp. 7-8 (La.App. 3 Cir. 10/5/11), 72 So.3d 1017, 1022-23, *writ denied,* 11-2386 (La. 3/9/12), 85 So.3d 690, as follows:

> In brief, Defendant argues that this court should ignore the plurality ruling of *Apodaca v. Oregon,* 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), and hold that a ten to two verdict fails to satisfy due process of law. In *Apodaca*, the United States Supreme Court upheld non-unanimous verdicts in state felony cases. The Supreme Court concluded that the Sixth Amendment's jury trial guarantee did not require unanimous verdicts. The holding of *Apodaca* was discussed with approval by the Louisiana Supreme Court in *State v. Bertrand*, 08-2215, (La.3/17/09), 6 So.3d 738, while reviewing a Louisiana judicial district court's declaration that Article 782 was unconstitutional for the reason that it permitted non-unanimous verdicts. The Louisiana Supreme Court stated:
>
>> In *Apodaca,* the United States Supreme Court examined an Oregon statute similar to Article 782, in that the Oregon statute did not require unanimous jury verdicts in noncapital cases. In a plurality decision, the Court determined that the United States Constitution did not mandate unanimous jury verdicts in state court felony criminal trials, with four Justices holding that the Sixth Amendment guarantee of a jury trial, made applicable to the States by the Fourteenth Amendment, does not require that a jury's vote be unanimous. Justice Powell concurred in the judgment of the Court for reasons different than those expressed by the author of the opinion. Four Justices, disagreed, finding that the Sixth Amendment guarantee of a jury trial was made applicable to the States by the Fourteenth Amendment, and does require a unanimous jury.
>>
>> . . . .
>>
>> This Court has previously discussed and affirmed the constitutionality of Article 782 on at least three occasions. In *State v. Jones*, 381 So.2d 416 (La.1980), we ruled that Article 782 did not violate the Sixth and Fourteenth Amendments. Later, in *State v. Simmons*, 414 So.2d 705 (La.1982), we found that Article 782 did not violate either the Fifth or Fourteenth Amendments.

21

Finally, in *State v. Edwards*, 420 So.2d 663 (La.1982), we again affirmed the statute's constitutionality.

Despite defendants' arguments to the contrary, the case law of the United States Supreme Court also supports the validity of these decisions. Although the *Apodaca* decision was, indeed, a plurality decision rather than a majority one, the Court has cited or discussed the opinion not less than sixteen times since its issuance. On each of these occasions, it is apparent that the Court considered that *Apodaca's* holding as to non-unanimous jury verdicts represents well-settled law. For instance, in *Burch v. Louisiana*, 441 U.S. 130, 99 S.Ct. 1623, 1626-27, 60 L.Ed.2d 96 (1979), the Court matter-of-factly recognized the reasoning behind the *Apodaca* holding as support for its overturning of a jury conviction by a 5-1 margin. Further, in *Holland v. Illinois*, 493 U.S. 474, 110 S.Ct. 803, 823, 107 L.Ed.2d 905 (1990) (Stevens, J., dissenting), Justice Stevens stated that it was the fair cross section principle underlying the Sixth Amendment's right to a jury trial that permitted non-unanimous juries. Justice Scalia, a noted originalist on the Court, explicitly rejected a unanimity requirement in his dissent *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), saying:

> Of course the Court's holding today-- and its underlying thesis that each individual juror must be empowered to "give effect" to his own view--invalidates not just a requirement of unanimity for the defendant to benefit from a mitigating factor, but a requirement for any number of jurors more than one. This it is also in tension with *Leland v. Oregon* [343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952)] (citation omitted), which upheld, in a capital case, a requirement that the defense of insanity be proved (beyond a reasonable doubt) to the satisfaction of at least 10 of the 12-member jury. Even with respect to proof of the substantive offense, as opposed to an affirmative defense, we have approved verdicts by less than a unanimous jury. *See Apodaca v. Oregon* (citation omitted) (upholding state statute providing for conviction by a 10-to-2 vote).

> *McKoy*, 110 S.Ct. at 1246-47 (Scalia, J., dissenting)
> (emphasis in original). Likewise, in *United States v.*
> *Gaudin*, 515 U.S. 506, 115 S.Ct. 2310, 2314, 132
> L.Ed.2d 444 (1995), the Court, in a unanimous opinion,
> recognized the reasoning behind the *Apodaca* decision.
> Finally, Justice Souter, dissenting in *Rita v. United*
> *States*, 551 U.S. 338, 127 S.Ct. 2456, 2484, 168 L.Ed.2d
> 203, (2007) (Souter, J., dissenting), again recognized the
> *Apodaca* holding as well-settled law.

*Id*. at 741-42.

Defendant does not cite which contemporary United States Supreme Court cases call into question the court's plurality decision's reasoning in *Apodaca*. Defendant also does not provide an original argument other than the State failed to prove beyond a reasonable doubt Defendant's guilt because one juror voted not guilty to second degree murder. The above jurisprudence establishes that a ten-to-two vote is sufficient to convict. We find no merit to this assignment of error.

**PRO SE ASSIGNMENT OF ERROR NUMBER TWO:**

Defendant argues that his constitutional right to a speedy trial was violated. Defendant was indicted for the second degree murder of the victim on January 20, 2011. Louisiana Code of Criminal Procedure Article 578 provides:

> A. Except as otherwise provided in this Chapter, no trial shall be commenced nor any bail obligation be enforceable:
>
> (1) In capital cases after three years from the date of institution of prosecution;
>
> (2) In other felony cases after two years from the date of institution of the prosecution[.]

Accordingly, the State had until January 20, 2013, to bring Defendant to trial. Trial commenced on February 10, 2015, a few weeks more than four years after the indictment was filed. As noted above, on February 4, 2015, Defendant filed a "Motion to Quash Bill of Indictment for Expiration of Limitation on Trial,

23

with Incorporated Memorandum ([La.Code Cr.P.] arts. 531, 532, 578 *et seq.*)."

Following arguments, the motion was denied in open court on February 10, 2015.

Defendant now alleges that the trial court erred when it denied the motion to quash

in this case.

Louisiana Code of Criminal Procedure Article 580(A) provides:

> When a defendant files a motion to quash or other preliminary plea, the running of the periods of limitation established by Article 578 shall be suspended until the ruling of the court thereon; but in no case shall the state have less than one year after the ruling to commence the trial.

A preliminary plea, for the purposes La.Code Crim.P. art. 580, means any

plea filed after prosecution is instituted but before the previously scheduled trial

that causes the trial to be delayed, which includes properly filed motions to quash,

motions to suppress, or motions for a continuance, as well as application for

discovery and bills of particulars. *State v. Brooks,* 02-792 (La. 2/14/03), 838 So.2d

778. Joint motions for a continuance fall under the same rule. *State v. Duraso*, 12-

1463, 12-1465 (La.App. 3 Cir. 12/11/13), 127 So.3d 1015, *writs denied,* 14-50, 14-

74 (La. 6/20/14), 141 So.3d 286. The suspension lasts only from the date the

motion is filed until the date the trial court rules on the motion. When prescription

is suspended, the relevant period is not counted toward the time limitation.

Accordingly, the suspended time period is added to the time limitation for

commencing trial. Should the suspended time period exceed the original

prescription date, then the state has a minimum period of one year from the date of

the ruling in which to commence trial. La.Code Crim.P. art. 580. *See State v.*

*Rome*, 93-1221 (La. 1/14/94), 630 So.2d 1284.

24

*Chronology of events pertaining to time limitation on trial date*:

1. Defendant was indicted on January 20, 2011. The State had until **January 20, 2013**, in which to bring Defendant to trial.

2. Defendant was arraigned on January 21, 2011. Trial was set for September 5, 2011.

3. On May 25, 2012, because of a stay of proceedings requested by the State pending a writ to this court and to the supreme court, trial is re-fixed to June 18, 2012.

4. On June 18, 2012, the trial court granted Defendant's oral motion to continue trial to January 28, 2013.

5. On January 28, 2013, on request of the State, the matter passed.

6. On February 4, 2013, the trial court granted Defendant's oral motion to continue trial until April 1, 2013.

7. On April 1, 2013, the trial court granted Defendant's oral motion to continue trial until October 7, 2013.

8. On October 7, 2013, the trial court granted Defendant's oral motion to continue trial until February 24, 2014.

9. In February 2014, Defendant filed a "Motion for Ex Parte Hearing Re: Defense Expert." For whatever reasons, this motion is not in the record. However, on March 3, 2014, the State filed "State's Opposition to Defendant's Motion for *ExParte* Hearing Re: Defense Expert."

10. On March 5, 2014, the trial court granted Defendant's motion for funding. However, the written ORDER was not signed until August 26, 2014.

11. On May 23, 2014, the trial court granted the State's oral motion to continue trial until December 1, 2014. There was no indication in the record whether Defendant agreed or disagreed with the motion.

11. On June 23, 2014, Defendant filed a pro se "Motion to Quash" for failure to timely commence trial. The trial court denied the motion on July 10, 2014.

12. On December 1, 2014, the trial court granted Defendant's oral motion to continue trial to January 5, 2015.

13. On January 5, 2015, the trial court granted Defendant's oral motion to continue trial to February 9, 2015.

14. Trial commenced on **February 10, 2015**.

"When defendant has brought an apparently meritorious motion to quash based on prescription, the state bears a heavy burden to demonstrate either an interruption or a suspension of the time limit such that prescription will not have tolled." *Rome*, 630 So.2d at 1286. In this case, trial was originally to commence on January 20, 2013. Defendant was not tried until February 10, 2015, a little more than four years following the institution of prosecution. Therefore, it was the State's burden to show that the time to commence a trial against Defendant had not tolled.

We note that there were only two motions filed by Defendant that may have caused an actual time delay, the *ex parte* motion for funding (as asserted by the trial court) filed on February 21, 2014, and granted on March 5, 2014, and the pro se motion to quash filed on in June 2014 and denied on July 10, 2014.

At the hearing on the February 2015 motion to quash, the trial court ruled that the *ex parte* motion for funding for an expert constituted a preliminary plea. The trial court ruled:

> The only one that I want to comment on is the February 21st, 2014. It was an ExParte Motion for Funding. At the hearing initially it was to establish a prima facie case as to whether the Defense would be entitled to that. No ruling was made. And then, subsequent to that there was a subpoena and another hearing scheduled. And, I believe, the Defendant at that point had subpoenaed Dr. Welke. At that point there created a contradictory hearing that the State came forward with, basically arguing that they could not have ex parte hearings that involved State witnesses.

> I believe the State was successful on that motion. Dr. Welke was not to be heard without both parties being present in conjunction with that. And, then it was returned later for funding issues of which the record that's under seal will speak for itself.

26

But, I do find that to be a substantial motion probably more so than was mentioned in the State's brief or the Defense. And, I would find that that clearly would have suspended the interruption of the delays.

However, even if the trial court erred when it ruled that the *ex parte* motion for funding was a preliminary plea pursuant to La.Code Crim.P. art. 580, we find the error was of no import. On June 18, 2012, Defendant made an oral motion to continue trial, and the court reset trial for January 28, 2013. In *State v. Catalon*, 14-768, pp. 4-5 (La.App. 3 Cir. 12/23/14), 158 So.3d 114, 117, *writ denied*, 15-462 (La. 1/8/16), 184 So.3d 692, the court stated, "The defense's oral motion to continue on October 3, 2011, suspended the prescriptive period. The motion was immediately ruled on, as were the motions that follow, and gave the State 'no . . . less than one year,' or until October 3, 2012, to commence trial. La.Code Crim.P. art. 580." Therefore, the State had at least until June 18, 2013, in which to commence trial. Then, as noted above, Defendant moved to continue trial on February 4, 2013, April 1, 2013, October 7, 2013, and May 23, 2014. Each time Defendant made a motion to continue trial, which was granted by the trial court, the State had at least one year from the date the trial court granted the motion to commence trial. Therefore, the May 23, 2014 motion gave the State until May 23, 2015 to commence trial. On June 23, 2014, Defendant filed a pro se motion to quash which was denied on July 10, 2014, thereby setting the time limitation to commence trial until **July 10, 2015**, and trial commenced in February 2015.

In brief, Defendant argues that the trial court denied the June 23, 2014 motion to quash for the wrong reasons; therefore, the motion did not qualify as a preliminary plea. However, Defendant never objected, and whether the ruling was incorrect is not relevant to this issue.

27

There is no merit to this pro se assignment of error.

**PRO SE ASSIGNMENTS OF ERROR NUMBERS THREE AND FOUR:**

Defendant asserts that his right to an impartial jury was infringed upon when the trial court advised the jurors that the trial should not take too much time from their personal business. Defendant further notes in brief that the trial court read the jury instructions prior to deliberation while standing at the podium, rather than from the bench.

At the beginning of trial, the trial court advised the jurors that court time generally runs from 8:30 a.m. to 4:30 p.m. The trial court explained that it would try not to let the sessions run too late because it knew from experience that there was life outside the courtroom. Defendant asserts the trial court systematically reassured the jurors they would not have to stay later than 4:00 p.m. or 5:00 p.m. in the afternoon if possible.

Defendant combed the record for times when the trial court apprised the jury of what was about to occur time-wise and contends that certain comments made by the trial court intimating that the jury may have to deliberate late into the night did not make it into the trial transcript. Defendant asserts that the comment, "[t]his should not take long. This should be on the 8 o'clock news. If you're still deadlocked at 2:00, I'll consider releasing you," made from the podium, was not transcribed. Defendant contends that because of the comment, the jury felt pressured to quickly arrive at a verdict, thereby affecting its impartiality. Defendant insists that each time the trial court raised the possibility that the jury may have to stay later than normal courtroom hours, the comments "ratcheted" the jurors' anxiety to the point where they considered their "**liberty was more**

28

**important: Their own, or the Defendant's?** Not a difficult choice, and with a predictable result."

We find that there is no merit to this argument. A review of the record shows that the trial court attempted to let the jurors know what to expect throughout the presentation of the case. If anything, the trial court's comments were made to ease concerns about having to remain late in the courtroom. The trial court even advised the jury that it may be necessary for them to make arrangements at home because the trial could take longer than anticipated..

Finally, there is no authority that requires the trial court to read the jury instructions from the bench, and Defendant cited none. These assignments of error have no merit.

## PRO SE ASSIGNMENT OF ERROR NUMBER FIVE:

Defendant argues that he was denied his right to a public trial. He states in brief that, after closing statements and after the jury began its deliberation, his sister and sister-in-law went out to get sandwiches for the defense team. While they were gone, the courthouse doors were locked. When they returned, although the sandwiches were allowed back in, the women were not. When the jurors came back into the courtroom to be recharged with the jury instructions, they "observe[d] no females who had previously supported the Defendant, thereby influencing the jury and prejudicing the Defendant."

In a criminal case, the accused is afforded the right to enjoy a public trial by both the United States Constitution and the Louisiana Constitution. U.S. Const. amend. VI; La. Const. art. I, § 16. The right to a public trial is not a "limitless imperative[,]" the right is subject to the trial judge's power to keep order in the courtroom or to prevent unnecessary pressures or embarrassment to a witness.

*United States ex rel. Smallwood v. LaValle*, 377 F.Supp. 1148, 1151 (E.D.N.Y.), *aff'd*. 508 F.2d 837 (1974), *cert. denied*, 421 U.S. 920, 95 S.Ct. 1586, 43 L.Ed.2d 788 (1975).

However, this was not a matter of the trial court clearing the courtroom. Had Defendant's sister and sister-in-law remained in the courtroom after courthouse hours, they would not have been locked out, if indeed, this scenario was correct. Other family members and persons were in the courtroom at the time the verdict was read, after courthouse hours. Accordingly, there is no merit to this assignment of error.

## PRO SE ASSIGNMENT OF ERROR NUMBER SIX:

Defendant argues that he received ineffective assistance of defense counsel. In *State v. Walton*, 11-1085, pp. 6-7 (La.App. 3 Cir. 4/4/12), 87 So.3d 328, 332-33, *writ denied,* 12-875 (La. 10/26/12), 99 So.3d 639, this court set out the standard for establishing ineffective assistance, as follows:

> The Sixth Amendment of the U.S. Constitution provides a defendant with assistance of counsel for his or her defense. *See also* La. Const. art. 1, § 13. According to *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant seeking to establish ineffective assistance of counsel must prove that 1) the defense attorney's performance was deficient *and* that 2) the deficiency prejudiced the outcome of the trial.

> With regard to the question of whether the defense attorney's performance was deficient, "defense attorneys are entitled to a strong presumption that their conduct fell within the broad range of reasonable professional assistance." *State v. James*, 95-962, p. 5 (La.App. 3 Cir. 2/14/96), 670 So.2d 461, 465, citing *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) and *Strickland*, 466 U.S. 668, 104 S.Ct. 2052.

> Additionally, the defendant must demonstrate that the deficient assistance of counsel prejudiced his defense. *State v. Jones*, 33,657 (La.App. 2 Cir. 8/23/00), 765 So.2d 1191, *writ denied*, 00-2779 (La. 6/29/01), 794 So.2d 825. In short, the errors must have been so serious as to deprive the defendant of a fair trial. *Id.*, citing *Strickland*,

466 U.S. 668, 104 S.Ct. 2052. It is not sufficient for a defendant to show that the complained-of error had some conceivable effect on the trial's outcome. *Id.* Rather, the defendant is required to establish that, but for the error, "there is a reasonable probability the outcome of the trial would have been different." *Id.* at 1199. *See also State v. Truehill*, 09-1546 (La.App. 3 Cir. 6/2/10), 38 So.3d 1246.

We note that the courts have recognized that an ineffective assistance of counsel claim is typically more properly raised in an application for post-conviction relief than on appeal. *See State v. Leger*, 05-0011 (La. 7/10/06), 936 So.2d 108, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007). "Where the record, however, contains evidence sufficient to decide the issue, and the issue is raised on appeal by an assignment of error, the issue may be considered in the interest of judicial economy." *Id.* at 142.

We find that Defendant's allegations of ineffective assistance of counsel are conclusory and superfluous and that the record before this court is sufficient to address and resolve the issues.

"1.   Defense counsel failed to properly investigate and produce exculpatory evidence[.]"

Defendant notes that in Dr. Welke's autopsy report, under the subsection "FINDINGS[,]" there was a list provided which supported the finding that the victim was asphyxiated. First on the list was "a. History of being found unresponsive at residence." Defendant argues:

If the decedent had a personal history of being found unresponsive at her residence, that fact certainly could raise a concern that she had had yet another unresponsive episode, evidence the jury did not hear. There is a reasonable probability that the jury would have returned a different verdict if that statement in the Coroner's Report been fully investigated, explored, and presented in court before the jurors by Defense counsel.

A review of the report indicates that the "history" referred to was simply the "history" of the case that went to the coroner's office. If the victim truly had a history of being found unresponsive in the home, Defendant probably would have

31

known about it and alerted defense counsel to that fact.  There is no merit to this assertion.

> "2.  Defense counsel failed to object to the trial going beyond courthouse hours, particularly in light of the assurances the Court had given the jury, thereby preventing the jury from being impartial[.]"

As noted above, the trial court's attempt to keep the jurors apprised of the hours of the day that would be spent on the case was not a pressure tactic employed by the trial court and supported by defense counsel.  There is no authority that requires a jury trial to be conducted solely between 8:30 a.m. and 4:30 p.m.  There is no substance to this allegation and therefore no ground for an objection.

> "3.  Defense counsel failed to object to the jury trial going beyond courthouse hours, preventing the trial from being a public trial[.]"

As reflected in connection with Defendant's pro se assignment of error number five, above, there is nothing in the record before this court to establish that the trial court denied Defendant a public trial.  Accordingly, there was no reason for defense counsel to object on these grounds.

> "4.  Defense counsel failed to object to the jury not being fed when the Defense staff and observers were themselves hungry[.]"

In brief, Defendant argues that the jurors were not well-fed or rested and did not have adequate time to consider the charge.  He argues that had defense counsel objected these problems would have been addressed and "two or more jurors could have voted differently."  There is nothing in the record to indicate the jurors were hungry, tired, or rushed.  Jury deliberation commenced at 5:12 p.m. and concluded at 7:51 p.m.  This allegation of ineffective assistance is unsubstantiated and therefore, without merit.

"5.    Defense counsel failed to object to the [c]ourt's comments to the jury, preventing the jury from being impartial[.]"

Defendant does not make clear which comments he is referring to. If Defendant means the comments regarding the trial court's efforts to keep the jury informed as to the timing of the case discussed in Defendant's pro se assignments of error number three and four above, then there were no comments to which defense counsel should have objected. If there were no errors, then defense counsel's failure to object was not ineffective assistance of counsel.

However, Defendant may have been referring to the fact that the trial court inadvertently left out a paragraph from the jury instruction regarding the number of votes that were required to achieve a verdict. As the jury was leaving the courtroom to begin deliberation, the trial court asked the State and defense counsel if there were any objections to the jury instructions as just read. Defense counsel objected to the fact that the trial court did not advise the jury that, for second degree murder, a guilty verdict needed to be unanimous. This prompted the trial court to re-call that it had left out the instruction that ten votes were necessary for a guilty verdict. The trial court recalled the jury and instructed them accordingly. Contrary to Defendant's assertion, defense counsel did object. Furthermore, Defendant failed to show how the inadvertent omission was prejudicial to his case.

"6.    Defense counsel failed to object to Defendant's sister and sister-in-law being locked out of the courthouse[.]"

Once again, this allegation of ineffective assistance is unsubstantiated and therefore without merit.

"7.    Defense counsel failed to reveal to the Defendant that he, E. King Alexander, had been a candidate for the 14th Judicial District of Louisiana in 2014, but withdrew approximately one month before election, opposing G. Michael Canaday, the very judge in this action."

33

Defendant argues that this information was not disclosed to him prior to trial. Defendant maintains that in "filing for candidacy, then withdrawing 30 days before the election, Mr. Alexander assured that Judge Canaday would retain his seat unopposed, and possibly discouraging other potential challengers, a very generous gift indeed." Defendant contends that assuring that the judge was unopposed for re-election raised the appearance of impropriety and a clear conflict of interest. Defendant concludes that "[t]his conflict of interest adversely affected Defense counsel's performance but benefitted the Court's plan to conclude the trial by the end of the week regardless of how late the case ran, which may be the reason why appropriate objections were not raised." We find this assignment is raw conjecture, conclusory, and unsubstantiated.

We find that Defendant failed to establish any defect in defense counsel's performance in the current case. Accordingly, this assignment of error is without merit.

Finally, Defendant complains that the court reporter who transcribed the trial recordings intentionally left out portions of the conversations between the prosecutor and the trial court and intentionally left out of the transcript the reading of the instructions to the jury. He did not place this complaint under any assignment of error but discusses it in his statement of the facts of the case.

Defendant points to where defense counsel was cross-examining one of the State's witnesses and argues:

> As Mr. Alexander formulated his next question with Mr. Coward, Mr. Spees began speaking spontaneously. Ms. Hawkins, who was standing near the witness and the Court, turned to the Court and said, *soto voce,* **"Motion to strike."** The Court replied, **"Sustained."** Mr. Alexander learned of the exchange from an observer, which prompted the next dialogue[.]

The dialogue was a question to the witness, Sergeant Spees.

> Q. Okay, No, I think there was -- while I was conferencing here at the table with Mr. Coward, who was with me at the time on direct examination before the break before lunch and before the watching of the videos – that you gave an answer to a question of Ms. Hawkins and her – and – and she object to it as non-responsive. And, I'm told by another observer that the Court sustained an objection to non-responsive to something that you said. So, I think you've answered that now; true?

The State objected, and a short conversation ensued between defense counsel, the State, and the trial court as to whether the alleged objection occurred. The trial court concluded that "if it happened, it happened[,]" and cross-examination continued. Defendant concedes that the exchange did not impact the substance of the trial, but points out that it was indicative that the court reporter "**will**" edit the 'verbatim' transcript." Defendant then accuses the court reporter of intentionally not transcribing the jury instructions; therefore, there was no way of knowing what the trial court advised the jury regarding how many votes were required for a guilty verdict or any other instruction. He asserts that the reporter's failure to transcribe the jury charges "prejudices [him] by denying a full and accurate review." However, the jury instructions were admitted into the record and thus are available for a full review. We find that Defendant complaint against the court reporter is without merit.

## DISPOSITION

We affirm Defendant's conviction for second degree murder. However, the trial court is directed to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of the opinion and to file written proof in the record that Defendant received the notice.

**AFFIRMED WITH INSTRUCTIONS.**