# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 24-288

**STATE OF LOUISIANA**

**VERSUS**

**STEVEN DWAYNE RIGMAIDEN**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 12705-21
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**CHARLES G. FITZGERALD**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Candyce G. Perret, Jonathan W. Perry, and Charles G. Fitzgerald, Judges.

**AFFIRMED.**

**Annette Roach**
**Louisiana Appellate Project**
**Post Office Box 6547**
**Lake Charles, Louisiana 70606**
**(337) 436-2900**
**Counsel for Defendant/Appellant:**
         **Steven Dwayne Rigmaiden**

**Stephen C. Dwight**
**District Attorney**
**David S. Pipes**
**Assistant District Attorney**
**Fourteenth Judicial District**
**901 Lakeshore Drive, Suite 800**
**Lake Charles, Louisiana 70601**
**(337) 437-3400**
**Counsel for Appellee:**
         **State of Louisiana**

**FITZGERALD, Judge.**

Defendant, Steven Dwayne Rigmaiden, appeals his conviction for second degree murder.

On June 19, 2021, Ezekiel Joubert was shot and killed in Lake Charles, Louisiana. Two months later, Defendant was charged by Bill of Information with the second degree murder of Mr. Joubert. Then, in June 2023, a unanimous jury found Defendant guilty as charged.

Shortly thereafter, Defendant filed a motion for new trial, contending that the State failed to prove that he was the person who killed Mr. Joubert. A few months after that, Defendant filed a second motion for new trial, again attacking the sufficiency of the State's evidence. The trial court ultimately denied both motions. The trial court then sentenced Defendant to a mandatory life sentence at hard labor without benefit of probation, parole, or suspension of sentence.

Defendant now appeals his conviction. In his sole assignment of error, Defendant asserts that the evidence was insufficient to prove beyond a reasonable doubt that he killed Mr. Joubert.

## LAW AND ANALYSIS

Pursuant to La.Code Crim.P. art. 920, we initially find that there are no patent errors on the face of the record. We now turn our attention to Defendant's assigned error.

Defendant's assignment challenges the sufficiency of the evidence. A sufficiency-of-the-evidence challenge is reviewed on appeal under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt." *Id.* at 319. "This standard, now legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521.

In other words, the appellate court's function is not to assess the credibility of witnesses or to reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442. Rather, the reviewing court must afford great deference to a jury's decision to accept or reject the testimony. *State v. Allen*, 36,180 (La.App. 2 Cir. 9/18/02), 828 So.2d 622, *writs denied*, 02-2595 (La. 3/28/03), 840 So.2d 566, and 02-2997 (La. 6/27/03), 847 So.2d 1255, *cert. denied*, 540 U.S. 1185, 124 S.Ct. 1404 (2004). "Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency." *Id.* at 626.

### *Summary of the Trial Evidence*

The State's first witness was Michael Rachal. He was the supervisor of computer information systems at Calcasieu 911. In conjunction with his testimony, a thumb drive containing three 911 calls related to the June 19, 2021 shooting of Mr. Joubert was admitted into evidence.

The first call was received at 8:25 p.m. on June 19, 2021. This call was made by Mike Landry, who reported that he heard gunshots, went outside, and saw a man lying in the grass, bleeding. The second call came from Brett Joseph, and it was also received at 8:25 p.m. In this call, Mr. Joseph reported that he heard about four gunshots and then saw an individual lying motionless on the sidewalk. The third and final call was made at 8:26 p.m., but it was simply a transfer call between 911 and local law enforcement.

2

The State's next witness was Detective Russell Mixon of the Lake Charles Police Department. Detective Mixon testified that on the evening of June 19, 2021, he was dispatched to the intersection of Albert Street and Elder Street. He stopped his vehicle just short of the intersection because a bag was sitting in the middle of Albert Street. He then exited his vehicle and observed individuals on the side of the road pointing toward the intersection. Thereafter, Detective Mixon found "an individual motionless, unresponsive and in a fixed position."

The video recording from Detective Mixon's body camera was also admitted into evidence. And it shows that when Detective Mixon steps out of his vehicle, a bystander tells him to look for "a red Monte Carlo." After checking on the victim, Detective Mixon tells the spectators to stay close so he can get their information but asks them to back up so he can mark off the crime scene. A few minutes later, additional officers arrive at the scene from two different directions. The recording shows Detective Mixon giving instructions to these officers. One minute later, Acadian Ambulance medical technicians can be seen checking on the victim. And ten minutes after that, the victim is identified over the radio as Ezekiel Joubert. The body-camera footage also shows a bystander telling Detective Mixon that she heard three gunshots less than twenty minutes earlier.

The next witness was Brett Joseph. Mr. Joseph testified that he had lived in Calcasieu Parish for about thirty years and that his residence was on Albert Street in June 2021. He acknowledged having called 911 on June 19, 2021. According to Mr. Joseph, he was sitting on his porch, which is about forty to fifty feet away from where the victim was ultimately found.

As to the shooting, Mr. Joseph recalled that the victim was walking east on Elder Street. And at the same time, a car was traveling north on Albert Street. Then,

3

at the intersection of Elder and Albert Streets, the victim approached the car "like he knew him." Mr. Joseph explained that the victim was carrying a bag and that he approached the driver's side window of the car. Mr. Joseph next heard multiple pops, which he initially believed were fireworks. He then saw the victim jump and run away from the car which sped off heading north. Mr. Joseph explained that he did not see the victim in the grass and did not realize the man had been shot until sometime later.

Mr. Joseph identified the vehicle in question as a red Chevrolet—either a Monte Carlo or Impala—noting that his memory was not "all the way accurate on what [he could] remember." He then explained that the windows of the car were dark, making it impossible for him to see who was driving.

On cross-examination, Mr. Joseph acknowledged that he did not know how many people were in the car because the windows were up when it passed his house. And although Mr. Joseph did not know the victim personally, he did recognize him from the neighborhood.

The State's next witness was Officer Kristin Howell, who was a seven-year veteran with the Lake Charles Police Department. Officer Howell testified that on June 19, 2021, she was the evidence officer who processed the crime scene. She identified numerous photographs that were taken at the scene. She also identified two shell casings that were recovered.

According to Officer Howell, approximately six weeks after the shooting, she was dispatched to the I-10 service road to photograph and retrieve parts of a gun and live ammunition which had been found in an adjacent field with a metal detector. Officer Howell testified that the recovered ammunition consisted of 9 millimeter Luger bullets.

4

Detective Benjamin Randolph testified next. He was a twenty-one-year veteran of the Lake Charles Police Department. Detective Randolph explained that after he arrived at the crime scene on June 19, 2021, he was instructed to recover surveillance footage. To this end, he recovered footage from the Pryce/Miller Community Center, which is located on the corner of Albert Street and Beldon Street. This video recording shows a red Chevrolet Monte Carlo driving past the community center traveling north on Albert Street at 8:22 p.m. on June 19, 2021. This was one or two minutes after the shooting.

According to Detective Randolph, after license plate readers revealed that the same Monte Carlo was driving on Lake Street earlier that evening, he obtained surveillance footage from the Busy Bee gas station. This footage shows the Monte Carlo traveling north on Lake Street at 7:06 p.m. Next, surveillance footage from Open Air MRI shows the same vehicle traveling north on Lake Street at 7:07 p.m. And surveillance footage from JT's Seafood shows the vehicle continuing north on Lake Street at 7:08 p.m.

The Monte Carlo was then videoed pulling into the parking lot of the Dollar General store on Broad Street at 7:55 p.m. According to Detective Randolph, the footage from Dollar General shows Defendant turning off the car, exiting the vehicle, locking it, and entering the store at 7:57 p.m. Defendant then gets back into the Monte Carlo, alone, and leaves the Dollar General parking lot at 8:15 p.m., heading east on Broad Street, which Detective Randolph explained was in the general direction of the crime scene. Two minutes later, at 8:17 p.m., the Monte Carlo is seen on video surveillance from the McMillan Recreational Center, which is located two or three blocks from the scene of the shooting. And roughly four minutes after that, Mr. Joubert was fatally shot.

Detective Randolph then revisited the video footage from the Pryce/Miller Community Center. That video recording shows the Monte Carlo at 8:22 p.m., approximately one minute after the shooting, traveling north on Albert Street before turning onto Fruge Street, which leads to the I-10 service road.

Detective Randolph also obtained surveillance footage from the day after the shooting. In particular, the video recording from DW Jessen dated June 20, 2021, shows Defendant parking the Monte Carlo near his Iris Street apartment at 10:20 that morning.

The video recordings discussed above were admitted into evidence in conjunction with Detective Randolph's testimony.

The State then called Deputy Joe Duhon, who was a nine-year veteran of the Calcasieu Parish Sheriff's Office. Deputy Duhon explained that he was off-duty eating at a Wendy's fast-food restaurant on June 20, 2021, when he received a BOLO (be on look out) for a red Chevy Monte Carlo. Immediately thereafter, Deputy Duhon saw the red Monte Carlo drive past him. He left Wendy's, contacted the police department, and followed the vehicle to an apartment complex on Iris Street. Deputy Duhon then observed Defendant getting out of the vehicle and ultimately entering one of the apartments. Deputy Duhon left the area when the other officers arrived, changed into his uniform, and returned in time to assist in Defendant's arrest at the Iris Street apartment. And although Deputy Duhon could not remember what clothes Defendant was wearing on June 20, 2021, the deputy did confirm that Defendant was the only occupant of the Monte Carlo when it arrived at the apartment complex.

Officer Jessica Dougherty, a nine-year veteran of the Lake Charles Police Department, testified next. Officer Dougherty explained that her involvement in the

case began on June 20, 2021, when she was called out to Iris Street to photograph, secure, and remove the Monte Carlo to an evidence bay for the collection of additional evidence. Among other things, Officer Dougherty swabbed the area inside the vehicle near the driver's window and sent the swabs off for testing.

The State's next witness was Dr. Jack Hietpas, who was a senior research microscopist at Microtrace. Dr. Hietpas was tasked with determining whether the above swabs contained gunshot residue. And based on the presence of particles characteristic of gunshot residue on one of the swabs, he concluded "that a firearm was discharged in or close proximity to the vehicle. Or that an item that had gunshot residue on it came into contact with" the driver's door.

On cross-examination, Dr. Hietpas acknowledged that he could not say how long the gunshot residue had been on the door. He also acknowledged it was possible that someone could have fired a gun out of the passenger-side window and that gunshot residue could still end up on the driver's door. According to Dr. Hietpas, firing a gun "within several feet" of the door could lead to gunshot residue being present. He further acknowledged that because gunshot residue is transferable, its presence does not alone definitively prove that a gun was fired from the car.

The State then called Corporal Raymond Ford of the Lake Charles Police Department. Corporal Ford testified that on July 26, 2021, he was working a traffic accident when he was approached by an individual named Nathan Magee. According to the corporal, Mr. Magee handed him a Dollar General bag containing a Taurus GTS 9-millimeter pistol with a live round in its chamber. Although Mr. Magee left the area before Corporal Ford could question him, the corporal recalled Mr. Magee making a comment when he handed over the gun: something like he

7

"was gonna throw it away" and that it had been found about a month earlier; Mr. Magee also mentioned the Ezekiel Joubert homicide. Both the gun and bullet were admitted into evidence.

The next witness was Gregory Allen, who was a forensic firearms examiner with the Louisiana State Police. Mr. Allen testified that the two shell casings found at the crime scene were both "Blazer 9 millimeter Luger" cartridge cases; and that the two cartridge cases were fired from the same weapon, specifically the gun that Mr. Magee handed over to Corporal Ford.

Dr. Terry Welke, who was the coroner for Calcasieu Parish, was the next witness. Dr. Welke identified two gunshot wounds to the victim's torso and two graze wounds to the victim's left upper arm. Despite the four wounds, Dr. Welke could not say how many times the victim had actually been shot. He opined, for example, that the two graze wounds could have been caused by the same bullets as the wounds to the trunk. Thus, Dr. Welke concluded that "there's definitely two gunshots," while noting there may have been as many as four.

According to Dr. Welke, the gunshots went through the victim—as there were no bullets left in his body—and the bullets broke his ribs and injured both of his lungs. And although Dr. Welke could not say with certainty how far the gun was from the victim when it was fired, he explained that the lack of gunshot residue near the wounds indicated that the gun was at least two feet away from the victim when it was discharged.

The State's final witness was Detective Kirt Farquhar, who was a twenty-three-year veteran of the Lake Charles Police Department. He was also the lead investigator in this case. Detective Farquhar noted that when he arrived at the crime scene on June 19, 2021, the victim was lying in the grass on the southeast corner of

the Albert Street and Elder Street intersection. He also noted that there was a white bag in the middle of Albert Street and that the two recovered shell casings were located near the bag.

The next day, Detective Farquhar returned to the crime scene to look for additional evidence. This is when he learned of video footage showing the red Monte Carlo. In response, Detective Farquhar issued a BOLO for that vehicle. And upon learning that the Monte Carlo had been spotted, Detective Farquhar drove to the Iris Street apartment complex. Defendant was subsequently arrested. Shortly thereafter, Detective Farquhar obtained the license plate number for the Monte Carlo, and the registered owner of that vehicle was Defendant's mother, Kitina Rigmaiden.

Next, Detective Farquhar testified that he met with Mr. Magee on August 2, 2021. According to Mr. Magee, the pistol at issue was found a few days after the murder in a field adjacent to the I-10 service road. Mr. Magee then gave the pistol to Corporal Ford on July 26, 2021, many weeks after it had been found. Nonetheless, based on the information given by Mr. Magee, police searched the same field with a metal detector and found firearm parts which matched the subject pistol.

Detective Farquhar then testified about the route taken by the Monte Carlo prior to the shooting. According to the detective, the Monte Carlo passed the McMillan Recreational Center roughly two minutes after leaving Dollar General. The shooting occurred approximately four minutes later. Detective Farquhar testified that when he drove from the McMillan Recreational Center to the scene of the shooting, it took him approximately four to six minutes. The detective also addressed the video showing the car's movements immediately after the shooting. At that time, the car headed north away from the crime scene and ran a stop sign.

On cross-examination, Detective Farquhar acknowledged that he could not see from the surveillance videos if anyone other than Defendant was inside the Monte Carlo at any point during the night of the shooting. He simply noted that no one, aside from Defendant, got out of the vehicle at Dollar General. Regarding the gun, Detective Farquhar further testified that Mr. Magee told him that "a friend of [Mr. Magee's] found it and brought it to [Mr. Magee] and then showed [Mr. Magee] where it was at."

Also on cross-examination, Detective Farquhar acknowledged that a witness named Jaime Richard had given a statement saying she saw the shooting. Ms. Richard told officers that she saw the vehicle switch lanes and that the gunshots were fired out of the passenger window, not the driver's side. Ms. Richard also told officers that she could not see inside the vehicle because the windows were dark.

Yet according to Detective Farquhar, Ms. Richard's mother stated that Ms. Richard functioned at the mental equivalent of a sixth-grader despite being an adult. Additionally, Detective Farquhar did not believe that the evidence from the crime scene supported Ms. Richard's statement that the victim was shot from the passenger side of the vehicle. As Detective Farquhar put it, "the car would have to nearly be up on the sidewalk. And if the weapon was fired out of the passenger's window, the shell casings would have actually gone the opposite direction."

The State then rested its case. Defense counsel called no witnesses. And the jury subsequently returned a unanimous verdict of guilty as charged.

### Sufficiency of the Evidence—Second Degree Murder

Louisiana Revised Statutes 14:30.1(A)(1) defines second degree murder as "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]"

"Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant." *State v. Draughn*, 05-1825, pp. 7–8 (La. 1/17/07), 950 So.2d 583, 592–93, *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537 (2007).

As previously stated, Defendant challenges the sufficiency of the State's evidence to support a conviction for second degree murder. Defendant specifically argues that the evidence was insufficient to prove that he was the shooter. We disagree.

The State's case is based almost entirely on circumstantial evidence. Indeed, the only direct evidence is Mr. Joseph's testimony identifying the vehicle that the shooter was driving and his testimony that the victim approached the driver's window carrying a white bag when he was shot. Yet the circumstantial evidence adduced by the State creates a narrative of what was happening with that vehicle in the hours and minutes leading up to the shooting, the minutes immediately after the shooting, and the vehicle's subsequent seizure the following day.

To summarize, it is uncontested that the Monte Carlo was driving north on Lake Street about an hour before the shooting. It is also uncontested that at 7:55 p.m., Defendant pulled into the parking lot of the Dollar General on Broad Street in that same Monte Carlo—his mother's Monte Carlo. After turning off the car, Defendant exited the vehicle, locked it, and entered the Dollar General at roughly 7:57 p.m. Then, at 8:09 p.m., Defendant exited the store with a single plastic bag, placed the bag on top of the car, unlocked the door, and got back into the vehicle. At 8:15 p.m., Defendant left the Dollar General parking lot and headed east on Broad

11

Street. Two minutes later, at 8:17 p.m., the Monte Carlo is captured on video passing the McMillan Recreational Center. Four minutes later, the victim is shot dead. And a minute or so after that, at 8:22 p.m., the same Monte Carlo is videoed four blocks north of the shooting, running a stop sign and heading toward the interstate on-ramp. The first 911 call was made at 8:25 p.m. The following morning, the video recording from DW Jessen shows Defendant parking the Monte Carlo, alone, at the Iris Street apartment complex.

As explained by this court in *State v. Baumberger*, 15-1056, pp. 10–11 (La.App. 3 Cir. 6/1/16), 200 So.3d 817, 826–27, *writ denied*, 16-1251 (La. 5/26/17), 221 So.3d 859, *cert. denied*, 583 U.S. 950, 138 S.Ct. 392 (2017):

> When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir.1983). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams*, 13-497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024.

Here, the State argues that because Defendant was driving the vehicle from which the shots were fired less than ten minutes before the shooting, Defendant was beyond a reasonable doubt the shooter in the car. Also, to support the conclusion that Defendant was alone while he was driving the car immediately before the shooting, the State points out that it was late June and Defendant left the car turned off and locked for approximately fifteen minutes while he was shopping at Dollar

General.  In addition, forensic evidence identified gunshot residue on the inside of the driver's door.

Defendant, on the other hand, contends that the State failed to prove that he was the shooter simply because the video showing him driving the car "was taken approximately seven to nine minutes before the car is seen passing a recreation center at the corner of Albert Street and Fruge Street."  But here, Defendant fails to put forth an alternative hypothesis that explains how someone other than him fired shots from the driver's window, especially considering that he was clearly driving the vehicle less than ten minutes before the shooting.  The closest he comes to doing so is when he claims in his appeal brief that law enforcement assumed he "was the only person who had possession of the Monte Carlo from seven p.m. on June 19, 2021, until Deputy Duhon observed him get out of the car the morning of June 20, 2021."

In our view, only one hypothesis of innocence is presented: that at some point between Defendant driving away from the Dollar General and the shooting, someone else took Defendant's car, used it to commit the murder, then gave the car back to Defendant.  But this is the same hypothesis of innocence that the jury rejected at trial.

In *State v. Captville*, 448 So.2d 676, 680 (La.1984), the Louisiana Supreme Court addressed what happens when a jury reasonably rejects the hypothesis of innocence put forth by the defendant at trial:

> When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt.  An evaluation of the reasonableness of other hypotheses of innocence provides a helpful methodology for determining the existence of a reasonable doubt.  As we have recognized in such cases

13

as *State v. Wright*, 445 So.2d 1198 (La.1984), *State v. Graham*, 422 So.2d 123 (La.1982), and *State v. Sutton*, 436 So.2d 471 (La.1983), the court does not determine whether another possible hypothesis has been suggested by defendant which could explain the events in an exculpatory fashion. Rather, the reviewing court evaluates the evidence in the light most favorable to the prosecution and determines whether the alternative hypothesis is sufficiently reasonable that a rational juror could not "have found proof of guilt beyond a reasonable doubt". *Jackson v. Virginia*, above.

In our case, Defendant has put forth no argument or evidence to suggest any hypothesis of innocence, other than suggesting that someone else could have been driving the Monte Carlo at the time of the shooting, which would require someone to have taken the vehicle immediately before the shooting and then return it to Defendant thereafter. This argument was rejected by the jury based on the evidence adduced at trial, including witness testimony and video recordings.

Based on our review of the record, we conclude that a rational trier of fact, in viewing the evidence in the light most favorable to the prosecution, could have found that all reasonable hypotheses of innocence were excluded. And in viewing the evidence in this same light, we also conclude that a rational trier of fact could have found proof beyond a reasonable doubt that Defendant was guilty of second degree murder. Defendant's conviction is therefore affirmed.

## DISPOSITION

Defendant's conviction for second degree murder is affirmed.

**AFFIRMED.**