# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 25-398

**STATE OF LOUISIANA**

**VERSUS**

**DEQUINCY JAMEL LEWIS**

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 19-254559
HONORABLE KEITH J. COMEAUX, DISTRICT JUDGE

**********

**SHARON DARVILLE WILSON
JUDGE**

**********

Court composed of Shannon J. Gremillion, Sharon Darville Wilson, and Ledricka J. Thierry, Judges.

**AFFIRMED.**

**Hon. M. Michael Haik, III, District Attorney**
**W. Claire Howington, Assistant District Attorney**
**16TH JUDICIAL DISTRICT ATTORNEY'S OFFICE**
**300 Iberia St., Ste. 200**
**New Iberia, Louisiana 70560**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Edward K. Bauman**
**LOUISIANA APPELLATE PROJECT**
**Post Office Box 1641**
**Lake Charles, Louisiana 70602**
**(337) 491-0570**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Dequincy Jamel Lewis**

**WILSON, Judge.**

Defendant, DeQuincy Jamel Lewis, was convicted by a jury of one count of first degree murder. He was subsequently sentenced to life imprisonment without the benefit of probation, parole, or suspension of sentence. Mr. Lewis now appeals his conviction. For the following reasons, we affirm the conviction and sentence.

## I.
## ISSUES

In his attorney-filed brief, Mr. Lewis asserts the following assignments of error:

(1)    The evidence adduced at trial, when viewed in the light most favorable to the prosecution, was insufficient to find DeQuincy Lewis culpable of first degree murder beyond a reasonable doubt.

(2)    The trial court erred in allowing the State to introduce in evidence a video from DeQuincy Lewis' Facebook page that was irrelevant and prejudicial.

Additionally, in his pro se filed brief, Mr. Lewis asserts the following assignments of error:

(1)    The trial court committed structural error by seating a juror who personally knew the lead prosecutor, the elected District Attorney, multiple DA staff members, whose wife worked for the DA until 2022, and who was personally connected to the judge. This level of entanglement destroyed the constitutional guarantee of an impartial jury.

(3)    The trial court violated Mr. Lewis's Sixth and Fourteenth Amendment rights by preventing the defense from presenting a complete defense including prohibiting a standard reasonable-doubt demonstrative, restricting questioning on alternate suspects, and repeatedly sustaining State objections to critical defense evidence.

(3)    The State introduced testimonial evidence from the medical examiner, the DNA analyst, and the lead detective through surrogate witnesses who did not

perform the underlying work, in direct violation of *Crawford*, *Melendez-Diaz*, and *Bullcoming*.

(4) The State presented misleading forensic and ballistic evidence, and appellate counsel compounded the error by inaccurately stating that two casings were recovered when the record proves only one. These falsehoods infected the jury's understanding of the case.

(5) Appellate counsel rendered ineffective assistance by omitting critical constitutional issues, failing to challenge structural errors, and submitting a brief containing factual inaccuracies that undermined Mr. Lewis's appeal.

(6) The State's handling, presentation, and misrepresentation of the eyeglasses evidence— including the presence of a third DNA contributor revealed in testimony, the impossible location of the glasses behind the door, the trial court's restriction of cross examination into how the glasses arrived there, and the prosecutor's knowingly misleading theory in closing argument—violated due process, the Sixth Amendment, and the right to present a complete defense.

## II.

## FACTS AND PROCEDURAL HISTORY

Justin Primeaux and his girlfriend Brooke Cormier resided in a trailer home with Mr. Primeaux's father, Gerard Primeaux, located on Vieux Jacquet Road in Broussard, Louisiana. In the early morning hours of April 20, 2019, Ms. Cormier heard voices coming from outside the bedroom, and woke Mr. Primeaux. When Mr. Primeaux opened the bedroom door, two intruders, dressed in all black, were in the hallway. A struggle ensued between Mr. Primeaux and the intruders, during which he was shot twice. Ms. Cormier called 911 for help, but as she did so one of the intruders took her cell phone from her. After the intruders left, Ms. Cormier used Mr. Primeaux's cellphone to call 911. An ambulance transported Mr. Primeaux to the hospital where he later succumbed to his injuries.

Mr. Lewis was indicted by a grand jury for the first degree murder of Justin Elijah Primeaux, a violation of La.R.S. 14:30. Jury trial commenced on August 13,

2

2024.  On August 16, 2024, Mr. Lewis was found guilty as charged by a unanimous jury.  On October 10, 2024, Mr. Lewis was sentenced to life imprisonment, to be served without benefit of probation, parole, or suspension of sentence.  A timely motion for appeal was granted.

## III.

## LAW AND DISCUSSION

### ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record.  After reviewing the record, we find there are two errors patent.

First, the trial court gave Mr. Lewis incorrect advice as to the time period for filing post-conviction relief.  The trial court stated that Mr. Lewis had "two years within which to file for post-conviction relief" and stated that the "two-year period begins 30 days after your judgment of conviction becomes final."  Louisiana Code of Criminal Procedure Article 930.8(A) (emphasis added) provides that the time period for filing post-conviction relief is "two years after the *judgment of conviction and sentence* has become final[.]"  Because the trial court improperly advised Mr. Lewis, this opinion can and will serve as notice of the correct time limitation for filing an application for post-conviction relief.  *See State v. King*, 24-367 (La.App. 3 Cir. 2/19/25), 405 So.3d 1162, *writ denied*, 25-381 (La. 5/20/25), 409 So.3d 223; *State v. Mason*, 24-407 (La.App. 3 Cir. 2/5/25), 407 So.3d 822, *writ denied*, 25-270 (La. 4/29/25), 407 So.3d 620; and *State v. Washington*, 24-308 (La.App. 3 Cir. 2/12/25), 406 So.3d 579.

Secondly, we find that the trial court failed to state that the sentence was to be served at hard labor as required by La.R.S. 14:30.  While the minutes of sentencing

3

do indicate the sentence was imposed at hard labor, "when the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Thus, Mr. Lewis received an illegally lenient sentence. However, we find that no further action is required. In *State v. Brown*, 19-771 (La. 10/14/20), 302 So.3d 1109 (per curiam), the supreme court found that the court of appeal erred in vacating an illegally lenient sentence absent any complaint by the State. In the present case, the State has not lodged any complaint regarding Mr. Lewis's sentence. Accordingly, we will not disturb the trial court's imposition of sentence.

## COUNSEL FILED ASSIGNMENTS OF ERROR

## ASSIGNMENT OF ERROR NO. 1:

In his first assignment of error, Mr. Lewis claims the evidence presented at trial, when viewed in the light most favorable to the prosecution, was insufficient to find him guilty of first degree murder beyond a reasonable doubt.

*Evidence at trial*

At trial, Ms. Cormier, the victim's girlfriend, testified that she and Mr. Primeaux had been living with Mr. Primeaux's father for about a year. On the night of April 19, 2019, Ms. Cormier retired to bed after a long day of working and spending time with family. Mr. Primeaux had a friend at the house, who Ms. Cormier believed to be either Kealin Batiste or Jamerson Mouton. After Mr. Primeaux's friend left, he went to bed around 1:00 to 1:30 a.m. Ms. Cormier said she did not sleep well that night due to their dogs barking. At one point, she heard talking inside the residence, so she woke Mr. Primeaux. When Mr. Primeaux opened their bedroom door, Ms. Cormier saw two men, and they began struggling with Mr. Primeaux in the hallway outside their bedroom. Ms. Cormier grabbed her phone to call 911, but as she did so, the lights in the room came on, one of the intruders walked

4

up to her, grabbed her phone, and ended the call. Kory Latiolais, Executive Director of the St. Martin Parish 911 system, testified that this 911 call was received at 4:24 a.m. on April 20, 2019. Ms. Cormier described the person who grabbed her phone as a heavyset black male, dressed in all black, wearing a bandana and hoodie. She further testified that she could see the top of his face above the bandana. Ms. Cormier testified that she then heard two gunshots, and the intruders left through the back door. Mr. Primeaux walked to the living room and sat on the sofa while Ms. Cormier dialed 911 from his phone. Mr. Latiolais testified that the second 911 call was received one minute after the first call, and the second call lasted fifteen minutes.

Ms. Cormier testified that Mr. Primeaux was bleeding "from everywhere." She observed a gunshot wound to the lower left side of his abdomen, a big gash on the back of his neck, bruising, and a black eye. He was bleeding from multiple spots on his head. Both Ms. Cormier and Mr. Primeaux's father asked Mr. Primeaux if he knew who had done this, and he shook his head "no." An ambulance arrived and transported Mr. Primeaux to the hospital, and Ms. Cormier stayed in the ICU waiting room all day. About an hour after she left the hospital, she was informed that Mr. Primeaux had passed away.

On cross-examination, Ms. Cormier testified that she could see the eyes of the man who took her phone from her, and she did not believe he was wearing glasses. She also testified that she saw that his hands were black. The phone he took from her was later found in the yard. On redirect examination, Ms. Cormier testified that she was the only resident of the house who wore prescription glasses, and the glasses found on the scene were not there prior to the incident.

Lieutenant Jorge Young of the St. Martin Parish Sheriff's Office, a detective at the time of the incident, testified that a nine-millimeter Luger spent cartridge was located between the wall and the floor in the hallway near Mr. Primeaux's and Ms.

Cormier's bedroom, and a pair of black framed glasses was located behind the bedroom door. These items were forwarded to the Acadiana Criminalistics Laboratory for testing. A digital scale with "a little loose suspected marijuana" was found in the living room.

Captain of the Training Division of the St. Martin Parish Sheriff's Office, Ross Stevens, a detective at the time of the homicide, began working on the case on April 22, 2019. He testified that on the day prior to his involvement in the case, Detective Dobler collected a Smith and Wesson SD9 PD semi-automatic handgun that Mr. Primeaux's father had located in the residence. Detective Dobler attended the autopsy of the victim where he collected two nine-millimeter projectiles. A swab of the victim's DNA was also collected at the autopsy, and all these items were submitted to the crime lab for analysis as well.

Once Detective Stevens reviewed the evidence, he began conducting interviews of close family members as well as canvassing the area surrounding the Primeaux home for video surveillance. A nearby business, Blake's Auto Sales, had surveillance cameras that showed a vehicle traveling on the victim's road prior to, but during the timeframe of the 911 call. The vehicle was a silver or tan four-door sedan with a blemish or damage to the driver's door. After the lights on the car went off, Detective Stevens observed two lights coming on and moving around, like flashlights. From the time the car was seen on surveillance until the time of the homicide, no other vehicles were seen traveling on the victim's road. According to Detective Stevens, the car with the blemish on the door passed in front of Blake's Auto Sales and turned on the victim's road at 4:15 a.m. and left the victim's road at 4:27 a.m., after the 911 calls. Surveillance footage from two other nearby businesses showed a car similar to the one seen on the footage from Blake's Auto Sales.

On May 9, 2019, Detective Stevens received a call from Beeonca Marshall

who was working at Food-N-Fun the night in question. She recalled a man by the name of DeQuincy Lewis coming to the store that morning. When Detective Stevens reviewed surveillance footage from the store with her, she identified Mr. Lewis but was unsure of the identity of the person with him. The two suspects arrived at the store in what appeared to be a silver/tan Toyota. Once in the store, the man with Mr. Lewis took something from the store and put it in his front jacket pocket. Later investigation by Detective Stevens led him to believe that it was a pair of work gloves; however, on cross-examination, he acknowledged that he did not verify that the shelves were consistently stocked the same way and that the area in which the subject reached was a general supply area. He also acknowledged that the store employees did not indicate that anything had been stolen from the store. Finally, to Detective Stevens's knowledge, no one witnessed the suspects wearing gloves.

The video footage from the convenience store reflected that at 3:49 a.m., the subjects, dressed in all black, entered the silver/tan vehicle. At this point, Detective Stevens noticed a blemish or damage to the driver's side door and possibly the front fender well.

In addition to obtaining surveillance footage from various locations, Detective Stevens interviewed people hoping to gain leads. During his investigation, Detective Stevens interviewed a person named Tyler Rochon who provided the nickname "D" as a possible suspect. Additionally, a friend of Mr. Primeaux's, Blake Charles, was interviewed. During Mr. Charles's interview, he also provided the nickname "D" and showed Detective Stevens a photograph of Mr. Lewis. Through subsequent investigation, law enforcement learned that the person with Mr. Lewis during the homicide was Terrol Dugas of New Iberia. DNA reference samples were obtained from several individuals, including Mr. Dugas and Mr. Lewis.

Detective Stevens' further investigation revealed that Mr. Lewis's driver's

license photo matched the description of the suspect and the photograph he was shown by Mr. Charles. Mr. Lewis's public Facebook page included a photograph in which he was wearing black prescription glasses at work, like the pair collected and submitted to Acadiana Crime Lab for analysis. What stood out to Detective Stevens was the size of the frame and that the nose guards were pushed out. Detective Stevens noticed that in Facebook photographs taken after April 20, 2019, Mr. Lewis wore gold frame glasses to work. Pictures taken prior to April 20, 2019, showed him wearing gold frame glasses, but the pictures were from family functions and similar events. Detective Stevens' observations were that Mr. Lewis typically wore the black glasses to work prior to April 20, 2019. The Facebook photographs also showed Mr. Lewis wearing black with a black bandana.

Detective Stevens reviewed a video on Mr. Lewis's public Facebook page posted in February of 2019 in which Mr. Lewis talked about kicking people's doors in. On cross-examination, Detective Stevens acknowledged that Ms. Cormier told detectives that the door of their home did not close properly. Thus, Detective Stevens acknowledged the door of the victim's home may not have been kicked in. On redirect examination, however, Detective Stevens clarified that there was no indication that anyone in the household had given the intruders permission to enter the home.

From Mr. Lewis's Facebook page, Detective Stevens also learned that Mr. Lewis worked in an industrial facility. Detective Stevens visited several such facilities in search of Mr. Lewis's vehicle. At the Port of West St. Mary, Detective Stevens was successful in locating the vehicle, a gold Toyota Avalon with damage to the driver's side door and front fender well. Detective Stevens ran the license plate and learned the car was registered to Mr. Lewis's father.

One of the biggest breaks in the case came on May 22, 2019, when Detective

Stevens learned from the Acadiana Crime Lab that Mr. Lewis's DNA was found on the arm of the glasses found at the murder scene and that DNA from the blood splatter on the lens belonged to the victim. At this point, Detective Stevens began organizing information to obtain an arrest warrant. Mr. Lewis was arrested on May 30, 2019, and he had a Sig Sauer P238, .380 caliber gun in his car at the time.

Mr. Lewis was advised of his rights and then questioned about his whereabouts during the early morning hours of April 20, 2019. He said he attended a party in Lafayette with Joshua Hawkins, and the attire for the party was all black. The party ended at approximately 2:00 a.m., and the two left in Mr. Hawkins's white Buick. Mr. Hawkins drove Mr. Lewis to New Iberia where they arrived around 3:00 a.m. Mr. Lewis said after Mr. Hawkins dropped him off in New Iberia, Mr. Lewis went to Burger King, and he then went to a residence in Lydia, Louisiana. Mr. Hawkins was interviewed, and his story was not consistent with Mr. Lewis's.

Detective Stevens obtained a search warrant for Mr. Lewis's cell phone. The location records showed Mr. Lewis's phone pinged off a tower near the Cajundome in Lafayette at 2:13 a.m. and then off a tower in New Iberia at 3:13 a.m. At 4:31 a.m., the phone pinged off a tower on LA-182 near Highway 92 in Cade, which was five minutes after the 911 call. Thus, the cell phone records did not corroborate Mr. Lewis's statement regarding his location once he left New Iberia.

During Detective Stevens' testimony, a recording of a June 5, 2019, jail call was introduced. When Mr. Lewis was previously interviewed by law enforcement on May 30, 2019, he had not been told about the eyeglasses found at the scene. During the subsequent jail call, which was made five days after his arrest, the person speaking to Mr. Lewis asked him if he left his glasses at the scene, but Mr. Lewis said he did not want to talk about that.

Finally, Detective Stevens described photographs taken from the victim's

9

autopsy depicting a gunshot wound to the lower right abdomen and the neck/shoulder area. He testified that the death certificate listed the cause of death, which occurred at 7:17 p.m. on April 20, 2019, as a gunshot wound to the body. The manner of death was homicide.

Beeonca Marshall, who was mentioned during Detective Stevens's testimony, was called as a witness. She testified that she worked at the Food-N-Fun in Broussard and had worked a shift from 10:00 p.m. on April 19, 2019, to 6:00 a.m. on April 20, 2019. During her shift, Mr. Lewis and another guy she did not know came into the store. Ms. Marshall had known Mr. Lewis for years, having attended both middle and high school with him. Because of this, she easily identified him in the store surveillance.

Sergeant Dina Theriot, a forensics detective with the St. Martin Parish Sheriff's Office, testified that she created a map of Mr. Lewis's cell phone locations utilizing his cell phone records and CellHawk, a web-based program. She confirmed that her examination revealed that Mr. Lewis's cell phone obtained service in the Lafayette area from 2:13 to 2:35 a.m. At 2:41, the phone received service in the vicinity of Broussard, Louisiana. From 2:57 to 3:01 a.m., the phone received service in the vicinity of Cade, Louisiana. At 3:17 a.m., the phone received service near Terrol Dugas's residence. Then, at 3:26 a.m., the phone received service in the New Iberia/Lydia, Louisiana area. At 3:31 a.m., the phone was headed toward Cade, Louisiana. At 3:35, 3:39, and 3:47 a.m., the phone pinged off a tower in Cade. The next pings at 3:53 and 4:03 a.m. were from the same tower. At 4:30 a.m., the phone was still in the Cade area. The 911 call was made at 4:26 a.m.

During follow-up questioning, Sergeant Theriot explained that in 2019, the cellular company was unable to tell which tower, at what time, and how long the cell phone pinged off each tower. She explained that because Cade is in a rural area, Mr.

Lewis's phone would continually try to find the best tower to provide service to the device. Basically, Mr. Lewis's cell phone was jumping between the five cell towers in the vicinity of Cade, Louisiana, and they were the closest towers to the victim's residence.

Records showed that at 4:31 a.m., a phone call was made from Mr. Lewis's phone, and Sergeant Theriot confirmed that the phone was "heading the - - towards the direction of leaving the crime scene." Sergeant Theriot explained that when a mobile device is attempting to access the internet, a tower farther away is activated to provide the service; however, when a phone call is made, the mobile device finds the closest and strongest signal. Thus, when the 4:31 a.m. phone call was made, the closest tower available was utilized, and it was less than two miles from where the victim was killed. The next ping was at 4:42 a.m., and it indicated the phone was traveling. The following ping, at 5:01 a.m., was in the vicinity of Terrol Dugas's residence. At 5:34 a.m., the ping was in the vicinity of Lydia near Hardin Street, which was the location of a relative of Mr. Lewis.

Claire Guidry of the Acadiana Crime Lab was accepted by the court as an expert in the field of forensic DNA and TrueAllele analysis. She performed the TrueAllele analysis in this case, and the DNA was processed by her coworker, Jeremy Dubois. Some of the profiles Mr. Dubois obtained had to be forwarded to Ms. Guidry for TrueAllele analysis. She explained that when a mixed DNA profile containing DNA from more than one individual is obtained, TrueAllele analysis is required to separate the DNA contributors. Ms. Guidry confirmed that the pair of black-rimmed eyeglasses recovered from behind the victim's bedroom door were found to have DNA from both the victim and Mr. Lewis.

Muhammad Yasin of the Acadiana Crime Lab was accepted by the court as an expert in firearms identification. He compared the two bullet fragments

11

recovered at the victim's autopsy with a Smith and Wesson 9 mm Luger-caliber pistol and .380 auto-caliber pistol and determined the bullets could not have come from either firearm. One firearm had been collected from 1032 Vieux Jacquet, the victim's home, and the other firearm was collected from the center console of Mr. Lewis's vehicle. Mr. Yasin also concluded that the two bullets had been fired from different firearms.

Davonte Gardner testified as a defense witness. Mr. Gardner referred to Mr. Lewis as "Kanky" and testified that he knew him from seeing him at the barbershop, playing basketball, and gambling. Mr. Gardner testified that a week or two prior to Easter weekend in 2019, he saw Mr. Lewis at Southside Park carrying a booksack. Mr. Lewis wore glasses, except when he played basketball. At the end of the night as people were leaving the park, Mr. Lewis asked everyone where his bag was. Terry Henry, Jr., a good friend of Mr. Lewis's, testified that he was also at Southside Park the week of Easter. He saw Mr. Lewis arrive wearing glasses and carrying a backpack. According to Mr. Henry, Mr. Lewis did not wear his glasses when he played basketball. "He put it all down with his bag," and when Mr. Lewis finished playing, he could not find his bag.

On appeal, Mr. Lewis challenges the adequacy of the evidence presented by the State, pointing out several things lacking in the investigation. First, no one saw Mr. Lewis shoot Mr. Primeaux, authorities did not attempt to lift fingerprints from the scene, the people in the victim's house prior to the shooting were not interviewed by authorities, no weapons involved in the murder were recovered, and there was a mixture of three DNA profiles on the glasses, one being from an unknown individual. Additionally, Mr. Lewis points out that Ms. Cormier testified she went to bed early, so she could not know how the glasses ended up there.

Next, Mr. Lewis notes that although the cell phone records put him in the

vicinity of the murder, they do not pinpoint his location. Additionally, he contends there was no way to know who was using his phone at the time. Finally, Mr. Lewis points out that video footage showed a man riding a bicycle near the crime scene in the early morning hours of April 21, 2019, and the investigators did not ascertain who the man was. Mr. Lewis surmises that detectives did not do these things because Blake Charles and Tyler Rochon "conveniently" provided Mr. Lewis's name as a possible suspect. For these reasons, Mr. Lewis contends the evidence admitted at trial was insufficient to exclude every reasonable hypothesis of innocence, and his conviction should be reversed.

*Discussion*

At the time of the offense, La.R.S. 14:30 defined first degree murder in pertinent part as:

A. First degree murder is the killing of a human being:

(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, aggravated or first degree rape, forcible or second degree rape, aggravated burglary, armed robbery, assault by drive-by shooting, first degree robbery, second degree robbery, simple robbery, terrorism, cruelty to juveniles, or second degree cruelty to juveniles.

Aggravated burglary is defined in La.R.S. 14:60 as follows:

A. Aggravated burglary is the unauthorized entering of any inhabited dwelling, or of any structure, watercraft, or movable where a person is present, with the intent to commit a felony or any theft therein, under any of the following circumstances:

(1) If the offender is armed with a dangerous weapon.

(2) If, after entering, the offender arms himself with a dangerous weapon.

(3) If the offender commits a battery upon any person while in such place, or in entering or leaving such place.

Armed robbery is defined in La.R.S. 14:64 as follows:

13

A. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.

The analysis for insufficient evidence is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 [(1979)], *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371. Additionally, "the testimony of a single witness, absent internal contradictions or irreconcilable conflicts with physical evidence, is sufficient to support a conviction." *State v. Jeter*, 09-1004, p. 3 (La.App. 3 Cir. 4/7/10), 33 So.3d 1041, 1043.

Regarding appellate review in cases relying on circumstantial evidence, this court has stated the following:

> When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir.1983). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering

14

circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams*, 13-497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024.

*State v. Baumberger*, 15-1056, pp. 10-11 (La.App. 3 Cir. 6/1/16), 200 So.3d 817, 826–27, *writ denied*, 16-1251 (La. 5/26/17), 221 So.3d 859, *cert. denied*, 583 U.S. 950, 138 S.Ct. 392, 199 L.Ed.2d 290 (2017).

*State v. Johnson*, 24-462, pp. 4–5 (La.App. 3 Cir. 5/8/25), 416 So.3d 627, 630–31 (alteration in original).

We find that a rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded in this case. Mr. Lewis's statement of his whereabouts in the early morning hours of April 20, 2019, did not align with the evidence obtained by law enforcement. Mr. Lewis was identified by a clerk in the Food-n-Fun convenience store at 3:40 a.m. on the morning of the murder accompanied by another individual. The two were seen leaving the store in a silver or tan sedan with damage to the front driver's side door. Surveillance video in the area showed a vehicle matching that description enter and leave the victim's road during the time of the break in and shooting. No other vehicles were seen on the victim's road during that time. Mr. Lewis's cell phone received service from a tower within two miles of the victim's home during the murder timeframe.

The evidence presented at trial showed the perpetrators entered the victim's home without consent wearing all black with bandanas covering their faces. Eyeglasses left at the scene contained both Mr. Lewis's and the victim's DNA. Thus, the evidence presented by the State clearly showed Mr. Lewis was involved in the victim's murder.

While the two intruders were in the victim's home, they fought with the

victim. In addition to shooting him, they also inflicted bodily injury. One of the intruders described as a heavyset black male took Ms. Cormier's cell phone without her consent as she tried to call for help. Clearly, this meets the definition of aggravated burglary by two means. The perpetrators, armed with dangerous weapons, committed an unauthorized entry of an inhabited dwelling where people were present with the intent to commit a felony or theft therein. Additionally, even if unarmed, by fighting with the victim, they committed a battery upon him while in the home. Either of these satisfy the elements of aggravated burglary. La.R.S. 14:60. Alternatively, the taking of Ms. Cormier's cell phone while armed with a dangerous weapon was armed robbery. If the perpetrator was unarmed at the time, taking the cell phone by use of force or intimidation was simple robbery. Clearly, the State proved an underlying felony as required by La.R.S. 14:30.

Next, there must be specific intent to kill or to inflict great bodily harm while engaged in the perpetration of the felony. In *State v. Ford*, 25-96, p. 22 (La.App. 3 Cir. 9/17/25), 420 So.3d 814, 826, this court discussed specific intent:

> Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La.R.S. 14:10(1). Specific intent may be formed in an instant and may be inferred from a defendant's actions and the circumstances surrounding the incident.

We find that specific intent to kill was clearly established by the shooting of the victim in the neck/shoulder and abdomen. The firearms identification expert testified that the two bullets obtained from the victim's body during the autopsy were fired from two different weapons. In Ms. Cormier's 911 call, she indicated that the two suspects were both armed with guns. Thus, it is likely the victim was shot by both Mr. Lewis and his accomplice.

Even if Mr. Lewis's accomplice was the lone shooter, there was sufficient

16

evidence to prove Mr. Lewis acted as a principal to first degree murder. "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." La.R.S. 14:24.

> Not all principals are automatically guilty of the same grade of the offense. . . . [I]n order to be a principal to first degree murder, an accused who did not physically commit the crime must be shown to have personally possessed the specific intent that the victim be killed.

*State v. Ortiz*, 96-1609, p. 13 (La. 10/21/97), 701 So.2d 922, 931, *cert. denied*, 524 U.S. 943, 118 S.Ct. 2352 (1998).

In *State v. Brooks*, 505 So.2d 714, 717–19 (La.) (first and second alterations added), *cert. denied*, 484 U.S. 947, 108 S.Ct. 337 (1987), the supreme court discussed jurisprudence involving principals:

> In [*State v.*] *Holmes*, [388 So.2d 722, 726 (La.1980),] the jury convicted defendant of first degree murder committed during an armed robbery (of an A & P store) in which defendant participated. Defendant had furnished the getaway car and had arranged for the shotgun which was used in the robbery. During the robbery, defendant tried to unholster the security guard's pistol. The guard realized what was happening and reached for his holster. When he moved, the other robber fired the fatal shot. Defendant then took the guard's pistol and used it to threaten and pistol-whip a customer. The majority of this Court found that the circumstantial evidence excluded all reasonable hypotheses of innocence.

> > The evidence at trial proved the defendant's considerable involvement in the planning and execution of the robbery. In fact, [defendant] was the one who obtained the shotgun and placed it in the car. In light of this proof, along with his acquiescence in the shooting of [the guard] and his own threats to kill, it is reasonable to infer that he intended the use of deadly force, if necessary to effectuate the robbery.

> 388 So.2d at 728. Defendant's conviction and sentence were affirmed. *Id.*

> In *State v. Sonnier*, 380 So.2d 1 (La.1979), this Court affirmed

17

defendant's conviction of first degree murder but reversed defendant's death sentence and instead imposed a sentence of life imprisonment without benefit of parole, probation or suspension of sentence because defendant had played only a subsidiary role in most of the aggravating circumstances and because there were a large number of mitigating circumstances. While rabbit hunting, defendant and his older brother came upon a parked car with a young couple inside. Defendant's brother handcuffed the couple together and drove their car to a deserted oil field. Both brothers raped the girl. Defendant's brother then shot the couple while defendant held the flashlight. This Court found sufficient evidence to convict defendant of first degree murder. "The defendant was present during the entire chain of events culminating in the shooting. He admitted the rape . . . and held the flashlight while his brother shot the young couple." *Id.* at 4.

In this case, the evidence presented at trial showed the two perpetrators, dressed in all black with bandanas to disguise their appearance, arrived together at the victim's home in Mr. Lewis's car in the early morning hours. Together, they unlawfully entered the victim's home and struggled with the victim when he became aware of their presence. As soon as the victim was shot, the two immediately fled the scene together. Under the circumstances, even if Mr. Lewis was not the shooter, he actively participated in the execution of the offense and assisted in the overtaking of the victim, i.e., took actions demonstrating shared intent.

Based on the evidence and the cases cited herein, jurors could find that the evidence, viewed in the light most favorable to the State, established the elements of first degree murder beyond a reasonable doubt and rejected every reasonable hypothesis of innocence. Accordingly, this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NO. 2:

In his next assignment of error, Mr. Lewis contends the trial court abused its discretion in allowing the State to introduce into evidence a video from his Facebook page in violation of La.Code Evid. art. 404(B)(1), which provided, in pertinent part, at the time of trial:

> **B. Other crimes, wrongs, or acts; creative or artistic expression.** (1)(a) Except as provided in Article 412 or as otherwise

provided by law, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

According to Mr. Lewis's brief, the State indicated that in the video, Mr. Lewis said, "don't get on Facebook flashing your little money, because [Mr. Lewis] was going to kick your door in and he doesn't care if you got a man in there." The court allowed the admission of the video, finding it to be an inculpatory statement. Mr. Lewis notes that although counsel did not object to the lack of La.Code Evid. art. 404(B) notice, he did object to its introduction on the basis that the evidence was irrelevant and prejudicial.

A review of the record indicates the basis of the defense's objection to the video was that it was irrelevant, prejudicial, and that there was "no M.O. [Modus Operandi]." When the video was played for the judge's review, the State explained that Mr. Lewis was talking about stealing income tax money/busting people's doors in to steal from them. The court found the video admissible as an inculpatory statement. Defense counsel argued that no doors were "busted" in this case, but the judge reiterated that he was going to allow the video to be presented. Defense counsel then objected to the "prejudicial value" of the video.

The video was subsequently played for the jury during Detective Stevens' testimony. He confirmed that in the video, Mr. Lewis talked about kicking people's doors in, and in this case, the victim's door was kicked in. However, on cross-examination, after first testifying that the victim's door was forced open, Detective Stevens acknowledged that Ms. Cormier said the door did not lock properly, and he

19

acknowledged that it was pushed open, not kicked in.

On appeal, Mr. Lewis claims there is no connection between the video and the shooting of the victim two months later. Additionally, Mr. Lewis contends there was neither evidence that the victim's door was kicked in nor money taken from the residence. For these reasons, Mr. Lewis contends the trial court abused its discretion in allowing the video to be admitted.

As noted above, the basis of the challenge at trial was that the video was irrelevant, prejudicial, and that there was no "M.O." Although admissibility under La.Code Evid. art. 404(B) was not addressed by the trial court and could be found to be waived on appeal pursuant to *State v. Guillory*, 25-112 (La.App. 3 Cir. 9/17/25), 420 So.3d 806, we find there was no abuse of discretion by the trial court in admitting the video as it was relevant to show intent, motive, and plan.

In *State v. Moran*, 54,281, pp. 29–33 (La.App. 2 Cir. 5/25/22), 338 So.3d 1229, 1242–44, *writ denied*, 22-935 (La. 10/12/22), 348 So.3d 75, *cert. denied*, __ U.S. __, 143 S.Ct. 815 (2023), the second circuit stated:

> Moran's appellate counsel argues that the Facebook posts were not relevant, did not mention the victim, and had the effect of painting Moran as a bad guy.
>
> In general, courts may not admit evidence of other crimes or bad acts to show that a defendant is a man of bad character who acted in conformity with his bad character. [La.Code Evid.] art. 404(B)(1). However, the State may introduce evidence of other crimes or bad acts if it has established an independent relevant reason, namely, to show the defendant's motive, opportunity, intent, or preparation, or if the evidence relates to conduct constituting an integral part of the act or transaction that is the subject of the present proceeding. [La.Code Evid.] art. 404(B)(1); *State v. Brown*, 18-01999 (La. 9/30/21), 330 So.3d 199.
>
> . . . .
>
> Although evidence may be considered relevant and otherwise admissible under [La.Code Evid.] art. 404(B)(1), the trial court must still conduct a balancing test pursuant to [La.Code Evid.] art. 403. Regarding this balancing test, the *Taylor* court stated:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." [La.Code Evid.] 403. Any inculpatory evidence is "prejudicial" to a defendant, especially when it is "probative" to a high degree. As used in the balancing test, "prejudicial" limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."

[*State v. Taylor*, 16-1124,] at p. 18, [(La. 12/1/16),] 217 So.3d [283] at 295-6 (internal citations omitted).

A trial court's ruling on the admissibility of evidence of other crimes will not be overturned absent an abuse of discretion. *State v. Floyd*, 51,869 (La. App. 2 Cir. 6/27/18), 250 So. 3d 1165, *writ denied*, 18-1292 (La. 2/25/19), 266 So. 3d 288. The introduction of inadmissible other crimes evidence results in a trial error subject to harmless error analysis on appeal. *Id.* An error in the admission of other crimes evidence is not harmless unless a reviewing court determines that the verdict actually rendered was surely unattributable to the error. *State v. Brown*, *supra*; *State v. Johnson*, 94-1379 (La. 11/27/95), 664 So. 2d 94.

. . . .

At the art. 404(B) hearing, the State maintained the Facebook posts showed evidence of proof of motive, absence of mistake or accident, and that Moran was the aggressor. The trial judge ruled they should be admissible to the extent they contained threats. The trial judge stated that the "clincher" for him was when Moran posted that he would kill someone who disrespected him or thought they were going to harm him.

Although the victim was not mentioned by name or nickname in any of the posts, the posts show that Moran was in a mindset to kill various individuals, including the police, or incite others to do his dirty work for him, in the days leading up to the murder of Johns. They showed Moran had the intent to kill and did not act in self-defense. The posts are certainly relevant under these circumstances when Moran asserts it was necessary for him to kill Johns in order to save his own life. Moreover, their probative value outweighed any prejudicial effect.

In this case, Mr. Lewis's posts appear relevant, as he posted content suggestive of entering homes by force to steal money. Mr. Lewis entered the

victim's home unlawfully but was met with resistance once inside, leading to the victim's murder. *Moran* suggests the posts at issue in this case were relevant to show Mr. Lewis's mindset.

Not only were Mr. Lewis's Facebook posts relevant, but they were also not unduly prejudicial. As noted in the assignment of error above, the State adduced evidence such as Mr. Lewis's vehicle being the only vehicle seen driving on the victim's road before and after the murder, cell phone records indicating his phone was receiving service from towers in the immediate vicinity of the victim's home during the time of the murder, and the presence of both his and the victim's DNA on eyeglasses which were left at the scene. In light of the strong case against Mr. Lewis, we find that the posts did not exert undue prejudice in his case. Accordingly, the trial court did not abuse its discretion in admitting the Facebook video, and this assignment of error lacks merit.

**PRO SE ASSIGNMENT OF ERROR NO. 1**

In his first pro se assignment of error, Mr. Lewis claims that structural error resulted when the trial court allowed the seating of a juror who had multiple personal, professional, and social connections to the State and the trial judge. In support of this claim, Mr. Lewis points to several relationships which he believes destroyed juror Matthew Musumeche's ability to be impartial. Prior to 2022, Mr. Musumeche's wife, an attorney, had worked for the D.A.'s Office. During voir dire examination, Mr. Musumeche said he knew District Attorney Bo Duhe from Chamber of Commerce get-togethers and from his wife working with Mr. Duhe. Mr. Musumeche also said he had met Alister Charrier, the lead prosecutor in this case, in passing. Additionally, Mr. Lewis points out that the trial judge told Mr. Musumeche to tell Dennis (Mr. Musumeche's father-in-law who went to law school with the judge) hello for him.

A review of the record reveals there was no challenge for cause made as to Mr. Musumeche. The defense's failure to challenge Mr. Musumeche for cause waived the issue before this court. Not only is a challenge for cause required, but if the challenge is denied, an objection must be made to that denial to preserve the issue for appeal.

> The legislature in amending La.[Code Crim.P.] art. 800(A) clearly stated, "A defendant may not assign as error a ruling refusing to sustain a challenge for cause made by him, unless an objection thereto is made at the time of the ruling." We find that the legislature clearly said what it meant in Article 800(A) and meant what it said. While it is settled that an objection need not be raised by incantation, the article requires that a defendant make a contemporaneous objection to a ruling that has denied his cause challenge, and the article further provides: "The nature of the objection and grounds therefor shall be stated at the time of objection." That did not happen here. Instead, the record shows that defendant did not object to the two rulings that he later assigned as errors on appeal. Therefore, the court of appeal erred in reviewing one of those assignments and in finding that the cause challenge itself sufficed to preserve the issue for appellate review. Accordingly, we reverse the ruling of the court of appeal. We reinstate defendant's conviction and sentence, which we hereby affirm.

*State v. Sagastume*, 22-1824, pp. 8–9 (La. 12/8/23), 379 So.3d 1243, 1249.

Clearly, a challenge for cause and an objection to the denial of a challenge for cause is required to preserve an issue for appeal. Accordingly, this issue was waived.

**PRO SE ASSIGNMENT OF ERROR NO. 2**

In his second pro se assignment of error, Mr. Lewis claims the trial court violated his Sixth and Fourteenth Amendment rights by preventing him from presenting a complete defense. First, Mr. Lewis contends he was denied the ability to present a meaningful closing argument when the court prohibited the use of a standard chart explaining reasonable doubt. According to Mr. Lewis, the chart was used during voir dire, and he claims it would have assisted the jury in understanding the burden of proof.

A review of the record shows that when defense counsel sought to use the

chart for his closing argument, the State objected on the basis that the chart was not in evidence. The court sustained the State's objection, and there was no objection to the trial court's ruling, nor was there a proffer of the chart for purposes of review. Thus, this issue was not properly preserved for review.

This court addressed a similar situation in *State v. Hebert*, 443 So.2d 613 (La.App. 3 Cir. 1983), *writ denied*, 444 So.2d 1215 (La.1984). In *Hebert*, the defendant asserted error regarding the trial court's denial of the jury's request to view a chart used by the prosecutor during closing argument. This court found no merit to the argument, stating:

> The "chart" requested by the jury is not in the record, therefore, we could not rule upon whether the trial court abused its discretion. We do not find it necessary to make such a ruling because no contemporaneous objection was made to the trial judge's ruling, and it is, thereby, not before us on appeal. [La.Code Crim.P.] art. 841. There is no merit in this assignment.

*Id.* at 619.

Mr. Lewis also contends that when he sought to introduce evidence regarding individuals present near the scene of the murder, individuals inside the home prior to the murder, and persons identified as potential suspects, the trial court repeatedly sustained the State's objections. He contends this arbitrarily excluded third-party guilt evidence.

In support of his claim, Mr. Lewis refers to three pages of the trial transcript without further explanation. A review of these pages revealed that the objections raised by the State which were sustained by the court were based on leading the witness, hearsay, and speculation. "A defendant is limited on appeal to the grounds for the objections articulated at trial." *State v. Johnson*, 389 So.2d 372, 377 (La.1980). Mr. Lewis did not object to the trial court's rulings on the State's objections. For this reason, this claim is not properly before this court on appeal.

24

Next, Mr. Lewis argues that the court prohibited cross-examination into Blake Charles despite the State opening the door. The State elicited testimony that Blake Charles mentioned Mr. Lewis as a possible suspect in the murder investigation, but Mr. Lewis contends defense counsel's questions about Mr. Charles were "blocked." Mr. Lewis alleges that this violated his right to confrontation because the defense had the right to explore the reliability of Charles' identification. In support of this argument, Mr. Lewis refers to the same record page references he previously cited. As discussed above, Mr. Lewis did not object to the trial court's rulings. Therefore, this claim is not properly before this court. *See State v. Vallo*, 13-1369 (La. 1/10/14), 131 So.3d 835.

Similarly, Mr. Lewis contends the trial court erred in prohibiting the playing of the first four seconds of the previously discussed Facebook video where he said he was working and not returning to jail. He contends this was exculpatory and violated the rule of completeness.

When the court stated that it was going to allow the Facebook video to be admitted in evidence, defense counsel, Mr. Vidal, objected to its prejudicial value. The prosecutor clarified that it was not planning to play the first four seconds of the video for the following reasons:

MR. SONGY:

For clarification note, just because I would like this on the record, too, Ms. Charrier said the first four seconds of that video won't be played.

MS. CHARRIER:

I am not playing. Because he says, "I'm not going back to jail."

MR. SONGY:

Because in  - -  correct. Because he said, "I'm not going back to jail this year."

25

MS. CHARRIER:

I'm not playing that.

MR. VIDAL:

Okay.

MR. SONGY:

We're not going to play that part.

MR. VIDAL:

Yeah.

MR. SONGY:

You had reacted to that, so I just wanted to make sure that that was clear on the record.

MR. VIDAL:

Okay.

MR. SONGY:

We're not playing that part.

MR. VIDAL:

Okay. Thank you.

THE COURT:

All right.

Mr. Lewis is factually incorrect in his assertion that the trial court prohibited the playing of the first four seconds of the video. Clearly, defense counsel expressed some concern over that portion of the video being played, and the State assured him it did not intend to play that portion. Accordingly, this claim has no merit.

Lastly, Mr. Lewis contends that the court violated his right to testify. Mr. Lewis claims the trial judge forced an immediate decision by him to either testify or waive the right entirely. Mr. Lewis states he was fatigued and felt he could not

testify "clearly" until the following day and being forced to make an immediate decision imposed arbitrary conditions on his right to testify.

A review of the record reveals that during a recess, outside the presence of the jury, the issue of whether Mr. Lewis wished to testify was taken up by the trial judge, defense counsel, and Mr. Lewis. Defense counsel confirmed that he had discussed the matter with his client. The judged asked, "and you discussed it with him, and it's y'all's decision, both his and yours, that he not testify?" Mr. Lewis and his attorney each responded, "Yes, sir." Immediately thereafter, the judge re-confirmed with Mr. Lewis that he did not wish to testify. Before recessing for the day, the court asked defense counsel whether he had any other witnesses, and he indicated that he did not. Likewise, the State confirmed that it had no further witnesses to present. The jurors were then sent to examine the evidence before going home for the day, and the judge indicated that closing arguments would commence the following morning. In *State v. Shepherd*, 23-135, pp. 41–43 (La.App. 3 Cir. 2/21/24), 380 So.3d 759, 781–82, this court addressed a similar situation:

> An accused's right to testify is a fundamental right of constitutional dimension. *Rock v. Arkansas*, 483 U.S. 44, 51–53, 107 S.Ct. 2704, 2710, 97 L.Ed.2d 37 (1987); *State v. Hampton*, 00-0522, pp. 4-5 (La.3/22/02), 818 So.2d 720, 723–724. Because the right is personal, it may be relinquished only by the defendant, and the defendant's relinquishment of the right must be knowing and intentional. *Hampton*, 00–0522 at 7, 818 So.2d at 725.
>
> . . . .
>
> It is firmly established that a trial judge may not *actively* interject himself into the defendant's decision, aided by input from his attorney, whether to testify in his own defense because judicial interference with this strategic decision poses a danger that the judge will appear to encourage defendant to invoke or waive this right. *United States v. Joelson*, 7 F.3d 174, 178 (9th Cir.1993). For this reason, the federal courts subscribe to the rule that a trial court has no duty to advise the defendant of his right to testify, or to ensure that an on-the-record waiver occurs.

27

> *Joelson*, 7 F.3d at 177. However, the absence of a duty in this regard clearly does not mean that a court does not have the discretion to conduct an on-the-record waiver outside the presence of the jury, so long as the court does not interject itself into the strategic decision made by the defendant with advice from his counsel.
>
> . . . .
>
> A review of the exchange between defendant and the trial court reveals no evidence of improper influence. The inquiry was an entirely neutral one in which the court neither urged nor prevented the defendant's testimony. Although the court's inquiry came after the State called its last witness but before it formally rested, there is no indication that the *timing* of the inquiry impacted the defendant's decision to waive his right to testify. That waiver appears on the record in unequivocal terms. In response to a benign inquiry from the trial court, devoid of any indicia of coerciveness, the defendant unhesitatingly waived his right to testify and further indicated that he discussed his waiver with his attorney.
>
> Under these circumstances, there is simply no evidence from which this court could conclude that the defendant's right to testify in his own defense was violated or that the trial court impermissibly discouraged the defendant from testifying. This assignment of error is without merit.

*State v. Shaw*, 06-2467, pp. 21-23 (La. 11/27/07), 969 So.2d 1233, 1246–47 (footnote omitted) (emphasis in original).

As in *Shaw*, the trial court's inquiry in the present case was a neutral inquiry, with no indication that the trial judge either urged or discouraged Defendant's testimony. The trial court's colloquy with Defendant in the present case focused on informing Defendant of the procedural, not substantive, aspects of his decision. The trial court left it up to Defendant's attorneys to discuss the substantive issues that must be considered and did not interject itself into the strategic decision made by Defendant. Finally, as the court noted in *Shaw*, the lack of a contemporaneous objection to the trial court's inquiry indicates "that, at the time it occurred, the inquiry was not deemed by either defendant or his counsel to be improper or coercive." *Id.* at 1247 n.8.

There is no indication from the record that the judge forced an immediate decision by Mr. Lewis as he alleges on appeal. Additionally, there is no indication that the judge either encouraged or discouraged Mr. Lewis from testifying. Finally,

as this court noted in *Shepherd*, the lack of a contemporaneous objection indicates that neither Mr. Lewis nor his attorney considered the court's inquiry to be coercive. For these reasons, this claim has no merit.

Mr. Lewis contends the alleged errors formed a continuous pattern of restricting his defense, and the cumulative effect rendered a fair trial impossible. However, Mr. Lewis has not established that any of his claims have merit. In *State v. Castleberry*, 98-1388, p. 51 (La. 4/13/99), 758 So.2d 749, 776, *cert. denied*, 528 U.S. 893, 120 S.Ct. 220 (1999), the supreme court stated, "As discussed throughout this opinion, the vast majority of the errors assigned by defendant are completely meritless. Those scant errors that are technically meritorious are harmless. We are 'unwilling to say that the cumulative effect of assignments of error lacking in merit warrants reversal of a conviction or sentence.'" Accordingly, Mr. Lewis's cumulative error argument also has no merit.

**PRO SE ASSIGNMENT OF ERROR NO. 3**

In his third pro se assignment of error, Mr. Lewis contends that the State violated his right to confrontation by presenting testimony of several witnesses who did not perform analysis, testing, and report preparation. Specifically, Mr. Lewis complains of the following: Detective Stevens testified regarding autopsy photographs, wound descriptions, bullet trajectories, projectiles removed, cause of death, and manner of death when he did not perform nor attend the autopsy; DNA tests results were presented through the testimony of Claire Guidry, who performed the TrueAllele analysis, instead of Jeremy Dubois who performed the original DNA testing and authored the report; and Deputy Young and other officers testified about evidence and photographs they did not personally document or discover. A review of the record reveals that no objection was raised as to the testimony or admissibility

29

of this evidence. Accordingly, these issues were waived for appeal. La.Code Crim.P. art. 841.

Mr. Lewis contends that because there were no eyewitnesses, a murder weapon, fingerprints, or DNA linking him to the crime, forensic testimony was essential to the State's case, and these violations cannot be deemed harmless. As Mr. Lewis did not establish that any of the foregoing claims had merit, a harmless error analysis is not warranted. Additionally, Mr. Lewis is factually incorrect in his assertion that there was no DNA evidence linking him to the crime as his DNA was found on eyeglasses left behind at the scene.

## PRO SE ASSIGNMENT OF ERROR NO. 4

In his fourth pro se assignment of error, Mr. Lewis claims the State misrepresented critical forensic and identity evidence, and appellate counsel repeated a material falsehood concerning shell casings. Mr. Lewis claims the record reflects that only one 9 mm spent casing was found, but appellate counsel incorrectly stated that two spent 9 mm casings were recovered. He contends that this factual error infected the sufficiency of the evidence review giving the false impression of multiple shooters and multiple shots. In support of his claim, Mr. Lewis references the firearms expert's testimony where he stated that a 9 mm cartridge casing was recovered.

At trial, Detective Stevens testified that a 9 mm spent cartridge casing had been located at the scene. The following day, Detective Dobler went back to the scene in response to a call from the victim's father stating that he had located a handgun in the house. Detective Dobler collected the handgun, and he then attended the victim's autopsy where he retrieved two 9 mm projectiles recovered from the victim's body.

30

While appellate counsel may have mistakenly indicated that two spent shell casings were recovered from the scene, an incorrect statement regarding the number of spent shell casings recovered has no impact on the review of the sufficiency of the evidence. As discussed in the sufficiency review, Muhammad Yasin of the Acadiana Crime Lab testified that two bullet fragments were recovered from the victim's body during the autopsy, and the bullets were fired from two different firearms. Thus, there was no false impression of multiple shooters and multiple shots as alleged by Mr. Lewis. This was factually established by Mr. Yasin's testimony. Accordingly, this claim has no merit.

Additionally, Mr. Lewis contends the firearm expert testified that both bullets, one 9 mm hollow point and one 9 mm full metal jacket, could both be fired from the same 9 mm handgun. According to Mr. Lewis, the prosecutor insinuated that two different bullet types meant two different shooters. Mr. Lewis contends this is scientifically false, and the prosecutor allowed the jury to believe something unsupported by the expert's testimony. However, as already stated, Mr. Yasin testified that the two bullets recovered from the autopsy were both 9 mm Luger-caliber. One was a hollow point style bullet, and the other one was a full-metal jacket style bullet. Comparing the two bullets to each other, Mr. Yasin concluded that the two bullets were fired from two different firearms. Thus, it was Mr. Yasin's testimony that indicated that two firearms were used, not insinuation by the prosecutor. Consequently, this claim has no merit.

Mr. Lewis argues that these misleading forensic claims and uncorrected factual inaccuracies had an "outsized" impact on the jury's verdict considering the State's case was based purely on circumstantial evidence. Mr. Lewis has not established that his claims in this assignment of error have merit, and the cumulative effect argument does not alter this conclusion. *See Castleberry*, 758 So.2d 749.

## PRO SE ASSIGNMENT OF ERROR NO. 5

In his fifth pro se assignment of error, Mr. Lewis contends he received ineffective assistance of appellate counsel in that appellate counsel misstated a material fact regarding only one shell casing being recovered, failed to raise the structural juror-bias error, and failed to raise the confrontation clause violations. Had these issues been raised by counsel, Mr. Lewis believes the outcome of the appeal would have been different and that the prejudice is "overwhelming."

Recently, in *State v. Brown*, 24-84, pp. 17–18 (La.App. 3 Cir. 12/17/25), __ So.3d __, __ (2025 WL 3649549), this court stated:

> While the issue of ineffective assistance of appellate counsel was not addressed in the appeal per se for obvious reasons, we find no abuse of discretion in the trial court's denial of relief on this claim. In *State ex rel. Sparkman v. State*, 15-1726, p. 3 (La. 10/17/16), 202 So.3d 488, 492, the supreme court addressed the issue of claimed ineffective assistance of appellate counsel:
>
>> The law on appellate representation is also frequently cited. In reviewing claims of ineffective assistance of counsel on direct appeal, the Supreme Court of the United States has expressly observed that appellate counsel "need not advance every argument, regardless of merit, urged by the defendant. *Evitts v. Lucey*, 469 U.S. 387, 394, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). The Court gives great deference to professional appellate strategy and applauds counsel for "winnowing out weaker arguments on appeal and focusing on one central issue if possible, and at most a few key issues. *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). This is true even where the weaker arguments have merit. *Id.* at 751–2, 103 S.Ct. 3308.
>>
>> When the claim of ineffective assistance of appellate counsel is based on failure to raise the issue on appeal, the prejudice prong of the *Strickland* test requires the petitioner to establish that the appellate court would have granted relief, had the issue been raised. *United States v. Phillips*, 210 F.3d 345, 350 (5th Cir. 2000).
>>
>> In the instant application, it is not easy to determine the exact claims made, but after reviewing the pro se application broadly, the court does not find either trial or appellate counsel were deficient in their representation. In

addition, the district court record and decision on appeal indicate zealous and competent representation.

As the review of the foregoing pro se assignments of error suggests, Mr. Lewis has failed to establish that any of the claims he alleges appellate counsel should have raised have merit. Accordingly, Mr. Lewis has not shown that this court would have granted relief had the issues been raised by counsel.

## PRO SE ASSIGNMENT OF ERROR NO. 6

In his final pro se assignment of error, Mr. Lewis contends the State's handling, presentation, and misrepresentation of the eyeglasses evidence violated due process, the Sixth Amendment, and the right to present a complete defense. Specifically, Mr. Lewis draws attention to the fact that DNA of a third contributor was found on the glasses. This fact was testified to by the DNA analyst and Mr. Lewis argues that it directly contradicts the claim that Mr. Lewis left the glasses at the scene. However, this evidence, which was heard and considered by the jury, in no way precludes them from accepting the State's version of events. Mr. Lewis also claims that glasses were found behind the bedroom door and because the struggle occurred in the hallway, the physical evidence makes the State's theory impossible. Again, this is not so. There are any number of ways that the glasses could have ended up on the other side of an open door during a struggle between three men and the State's version of events is not impossible.

Mr. Lewis further alleges that when defense counsel attempted to question Detective Stevens about how the glasses could have arrived behind the door, the prosecutor objected on grounds of speculation and the trial court sustained the objection. This, he argues, prevented the defense from presenting the only plausible explanation. Mr. Lewis did not object to the trial court's ruling. Thus, this claim is not properly before this court. Similarly, Mr. Lewis argues that the prosecutor

introduced her own speculative and unsupported theory in closing argument by telling the jury that the glasses fell off during the struggle, thereby creating a false impression. Again, Mr. Lewis failed to contemporaneously object and thus this claim is waived. La.Code Crim.P. art. 841.

Although not assigned as a separate error, at the close of Mr. Lewis's brief, he alleges that even if no single violation he raised was sufficient to warrant reversal of his conviction, the combined effect of the errors deprived him of a fair trial. Pursuant to *Castleberry*, 758 So.2d 749, Mr. Lewis's cumulative error argument has no merit.

IV.

## CONCLUSION

For the foregoing reasons, the conviction and sentence of Defendant, DeQuincy Jamel Lewis, are affirmed. We advise Mr. Lewis that in accordance with La.Code Crim.P. art. 930.8, no application for post-conviction relief shall be considered if it is filed more than two years after the judgment of conviction and sentence become final under the provisions of La.Code Crim.P. arts. 914 or 922.

**AFFIRMED.**